[Filed June 21, 1892.]

## STATE OF OREGON *v.* FRED ZORN.

CRIMINAL LAW—INSANITY.—In criminal actions, if it appear from the evidence, to the satisfaction of the jury, beyond a reasonable doubt, that at the time of the commission of the criminal act charged in the indictment, the defendant was laboring under such a defect of reason, from disease of his mind, as not to know the nature, quality, or consequences of the act he was committing, and was unable at the time to distinguish between right and wrong, he is entitled to be acquitted on the ground of insanity.

IDEM—DRUNKENNESS—MOTIVE AND INTENT.—Drunkenness of the defendant in a criminal action does not excuse him, but may be considered by the jury in determining the purpose, motive, or intent with which he committed the criminal act charged against him.

Umatilla county: M. D. CLIFFORD, Judge.

Defendant appeals. Affirmed.

*J. C. Leasure*, for Appellant.

*George E. Chamberlain*, attorney-general, for Respondent.

LORD, J.—The defendant was indicted, tried, and convicted of the crime of murder in the first degree, in shooting and killing his wife, Caroline Zorn. A motion for a new trial was filed, but overruled by the court, and the defendant was sentenced to be hanged. There are several assignments of error in the notice of appeal, but those relied upon for a reversal of the judgment relate wholly to

instructions excepted to as given by the court, and instructions asked by the defendant and refused by the court.

Before, however, proceeding to the consideration of these assignments of error, there is a preliminary matter, as regards practice, of considerable importance, which needs to be adverted to. The bill of exceptions discloses affirmatively that no objections were made or exceptions taken to any portion of the charge given by the court to the jury until after the verdict was returned into court, and that then, for the first time, counsel for the defendant asked permission to except to the charge, which the court allowed. It has been the uniform practice of this court to require that exceptions to instructions should be taken at the time of the trial, in order that the judge may have the opportunity, before the jury retires, to correct any error into which he may have fallen. To allow a party to take his chances upon a verdict on instructions given, without exception, and afterward, when the verdict is adverse to him, to challenge the correctness of such instructions, would needlessly multiply new trials and reversals. Had he made his objection, or taken his exception at the time such instructions were given, the court might have instructed the jury differently or obviated the objection. This court, in *State* v. *Dodson*, 4 Or. 67, adopts the language of the supreme court of California, in *Morgan* v. *Hugg*, 5 Cal. 409, and holds that "errors cannot be relied on in the appellate court which are not taken advantage of and raised at the trial." Any other rule, we think, would be extremely inconvenient and seriously obstruct the administration of justice. It seems, however, that the instructions asked by the defendant and refused by the court involve substantially the same questions as are raised by the instructions given by the court on its own motion, and excepted to, or to which the court permitted the defendant to note his exceptions after verdict. It was evidently for this reason, and to enable us to determine whether any injustice was done the defendant by the

instructions given, that the court allowed the exceptions, and certified the same to us, as if they were regularly taken. It is in view of these considerations, and the sacredness of life, that we proceed to their examination.

The instructions asked for and refused were directed to covering two grounds of defense, namely, insanity, as the result of delirium tremens; and drunkenness, as affecting the intent of the defendant in committing the act. If the instructions given by the court, to which exceptions were allowed, covered these points, and instructed the jury correctly as to the law, there was no error. It appears from the testimony that immediately prior to the shooting of his wife, the defendant had been at Walla Walla, a few miles distant from his home, for some two weeks, drinking much of the time to excess; that on the evening prior to the day when he shot his wife, he was seen by a member of the police force, who testifies that he was pretty well intoxicated, very nervous, and seemed to be " off his base," although the circumstances detailed and the conversation that occurred do not indicate any marked peculiarities of conversation or conduct other than would be likely to take place with any one in his condition. This officer says: "I knew he was drinking, and he seemed to be off his base, and he repeated the same question to me and I tried to change the conversation, and said, 'are you going home to-night?' He acted rather strange, and started a conversation about his family, and said he felt good, and that this would be the last drunk; that he was going back to his wife. He turned, after I left him on the corner, and went down the street; there was a German lodging-house down there, and I asked him, 'aint you going home to-night?' and he said, 'yes.'"

Instead of going to bed, he evidently walked home, as the testimony of his step-son is to the effect that he was at his own home at an early hour in the morning, rapping at his window and asking to be let in; that he went into his wife's room and remained there some time; that he ate

XXII OR.—38.

breakfast and dinner, and remained about the house during the day. Up to this time there is no evidence of any disturbance, or quarreling between the defendant and any member of his family. In the evening, at half-past five or six o'clock, his step-son, who was about seventeen years of age, testifies that he was in the yard, when he heard three shots, and shortly thereafter, his mother, Caroline Zorn, came out of the house, "in the yard, and right by the header she fell down"; that his grandmother and two little sisters led her back to the house; "they led her in; she fell down three or four times going in"; that he went for Mr. Richey, the sheriff, and the doctor; that his mother was shot in the breast and the back, and that his grandmother was shot in the left shoulder. There is no testimony in regard to the defendant's shooting his wife, or the circumstances under which the shooting was done, except the oral admissions of the defendant. Mr. Richey testifies in substance that when he reached the house he found the old woman in the kitchen, lying by the stove; that Mrs. Zorn was in a bedroom, and that Mr. Zorn was in bed in the front room, and his white shirt and coat and pants laid on the lounge, and his shoes were under the stand; that his face was covered with blood, and one pillow was blood all over. This witness says: "I had a pair of handcuffs with me; I slipped a handcuff onto one of his hands, when he said, 'don't put that on, I am shot.' I said, 'where are you shot?' and he said, 'in the mouth.' I asked him who done it, and he said he done it. I asked him who shot the women, and he said he did. I asked him how many times he shot his wife, and he said 'twice in the back,' but I found out afterwards he made a mistake; he shot her once in the back and once in the breast. He told me that he fired two shots at his wife and one at the old lady. When asked what he done the shooting for, he stated he went in the room there, and that they would not let him in, and he kicked the door open and shot them."

Sheriff McFarland testifies: "I asked him what he had done the shooting for; and he said they would not let him in, was the reply he made; and then he went on and told me the position he was in when he shot himself." Another witness says: "He just said he kicked the door in and shot them, and went and laid himself down in the bed, and he heard some one hollo outside, and he thought some one had come to take him, or shoot him, and he placed the revolver in his mouth and shot himself."

There are several other witnesses who were present upon the evening of the shooting after it occurred, who conversed with him in respect to it, before his wife, the old lady, and himself were carried to the hospital at Walla Walla, and all substantially agree to the same statement. Another witness who had a conversation with him afterward at Walla Walla testifies: "He told me that Friday — that was October 2d, I believe, — he saw his wife in Walla Walla, and he wanted her to take him out home with her, and she was to meet him but failed to do so; so he started to walk out there Saturday morning, and got there about breakfast time, and he took breakfast and went into the bedroom, and his wife went with him; and afterwards she went out, and he got up and had dinner, and stayed around until afternoon; and he wanted her to bring him back to town, and she refused to do it; and she went into the house and shut the door in his face, and that made him mad, and he broke the door in, and she said she would make him suffer for it, and he pulled his pistol out and shot her, and she ran out and her mother ran out, and he shot her, and then he went in and laid down in bed, and got to thinking about it, and concluded to kill himself, and he put the pistol to his mouth and pulled the trigger. That is about all he said."

The testimony of a number of the witnesses who were well acquainted with the defendant, and who saw him after the shooting of his wife, is to the effect that the defendant

seemed as rational as ever.   Mr. Richey testifies:  "He seemed to be just about like he always did, except his face was all blood.   After the doctor cleaned him up he was natural."   Doctor Keeler testifies that the defendant was "perfectly rational and normal in all respects, as far as I could see.   I would state, however, from the odor of the man's breath I was under the impression he had been drinking.   He was not intoxicated at the time."   Sheriff McFarland testifies:  "Well, the man appeared to be perfectly rational when he was talking to me.   I sat down opposite the bed and gave him a sip of water, and after he got the blood out of his mouth I think he talked as rational as he ever did talk."   The testimony of the stepson, who let the defendant into the house on the morning of his return from Walla Walla, and who saw him around through the day, does not indicate that the defendant was intoxicated.   There was also some evidence to the effect that about a month prior to the shooting, the defendant had made some threats to take the life of his wife.   ".Q.—State how the matter came up, and what you heard him say? A.— It was in regard to their business affairs.   She had bought out his interest; he talked several times during harvest; he would talk the matter over; and when he would get to studying about it he would get very mad about it, and he said he would go over there and kill the last damned one of them, or he had a mind to kill them.   Two different times this was brought up while he was at work for me." The witness then relates another conversation he had with the defendant after the shooting and death of his wife and while he was in jail.   He was relating to defendant in that conversation about getting the bullet out of his wife, and that she never spoke after that; that she only took the bullet in her hand and turned it over.   By the court: "Go. ahead and state what was said.   A.—He said she ought not to have bothered him; to have let him go to bed and he would not have done it."   Witness further testifies to

trouble between defendant and deceased on several occasions when they would come for him to go over. J. S. Warren testifies to having had a conversation with defendant in August or September in which he mentioned his wife's name. Witness was asked in this connection: "Q.—State to the jury what it was. A.—He went on to tell about his wife owing him, and if he was not paid he would go over there and kill the whole outfit. Q.—Did he make these statements more than once? A.—Yes, sir. Q.—Tell the jury all that was said in that conversation. A.—He was talking about his wife owing him a thousand dollars and applying for a divorce, or that she wanted a divorce. That she owed him one thousand dollars, and the oldest girl had went on as security, and if she didn't pay he would kill her and the whole outfit."

Substantially upon this state of facts, the contention for the defendant is, that the evidence tended to show that the defendant, at the time of the shooting, was suffering from the delirium tremens; and if the jury so found, as a consequence he was temporarily insane and must be acquitted. Hence, he claims that the instruction given by the court did not cover this phase of his defense, and therefore the instructions asked to that effect ought to have been given.

The court gave these instructions: "When a person is charged with the commission of a crime, he is entitled under the law to interpose as a defense a plea of insanity,—that is, unsoundness of mind, a derangement of intellect,—and if it be established upon the trial that the accused, at the time of the commission of the act, was laboring under such a defect of reason as not to know that the nature and quality of the act he was doing was wrong, he is entitled to an acquittal; but if it appears that the accused, although suffering from mental derangement, had capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he did, and that he had knowledge and consciousness that it was wrong and crimi-

nal, and would subject him to punishment, the defense will fail.

"If you are morally certain that at the time the prisoner committed the act he was laboring under such a defect of reason from disease of mind as not to know the nature, quality, or consequences of the act he was committing, and was unable at said time to distinguish between right and wrong, then you should acquit the defendant upon the ground of insanity.

"I charge you, gentlemen of the jury, that the defense of insanity under the laws of this state will be of no avail unless it is proven beyond a reasonable doubt that the accused, at the time of the commission of the act, labored under a diseased state of mind, and that it was so excessive that it overwhelmed his reason, conscience, and judgment."

We think these instructions covered the ground as to insanity. "In all cases," said NORTON, J., "where insanity is interposed as a defense, whether such defense be alcoholism in its c'‾ ‾nic form, or in its acute form, or delirium tremens, or dipsomnia, affective or emotional, ideational, or whether it be designated by any other of the various technical terms denoting peculiar forms of insanity,—the question is, whether such insanity rendered the person laboring under it incapable of distinguishing between right and wrong in respect to the act he was about to commit." (*State* v. *Erb*, 74 Mo. 203.) In the instruction given by the court, the jury was told, that if at the time the defendant shot his wife, he was insane, laboring under such a defect of reason that he did not know and comprehend the nature and quality of the act when he committed it, he was entitled to an acquittal; but that if he had capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act, he should be convicted. This was virtually saying to the jury, that to entitle the defendant to a verdict of not guilty on the ground of insanity, they must find from the evi-

dence that the defendant, at the time of shooting his wife, was of unsound mind,— that is, that his mental faculties were so deranged and perverted as to constitute unsoundness of mind and render him incapable of distinguishing between right and wrong, and of knowing whether the act he committed was right or wrong.

Under a similar instruction in *State* v. *Murray*, 11 Or. 418, THAYER, J., said: "The jury was told that if they were satisfied that at the time the prisoner committed the act, he was laboring under such a defect of reason from disease of the mind as not to know the nature, quality, or consequences of the act he was committing, or that if he did know it, he did not clearly understand what he was doing was wrong, then they should acquit him upon the ground of insanity. This was as far as the court could possibly go under the law." It seems to us the instructions given by the trial court are in conformity to the rulings of this court, covered the ground as to insanity, and rendered it unnecessary to give the instructions asked, conceding that they correctly stated the law applicable to the facts.

But it is extremely doubtful whether there is anything in the facts of this case at the time the shooting occurred upon which to found an instruction upon the theory that the defendant was suffering from temporary insanity as the result of intoxication or delirium tremens. All the testimony produced bearing upon the mental condition of the defendant a short time after the shooting, is to the effect that he was perfectly rational, and that he talked as rational as he ever did talk. But however this may be, the defense of insanity arising under the facts was put to the jury, and as we think, fairly and justly to the defendant.

Upon the other phase of the case, as to how far drunkenness may be proved to show the mental status of the defendant at the time of the shooting, so as to enable the jury to determine the intent of the accused in committing the act, the court instructed the jury as follows: "If you believe,

from the evidence of this case, that the defendant, at the time of the commission of the crime charged in the indictment, was in a state of voluntary intoxication, this fact of itself does not render the act less criminal, and in this sense, I charge you, is not available as a defense; but upon the question whether the act was done with deliberation and premeditation, as charged in the indictment, it is proper to be considered by you in connection with all other facts appearing on the trial in determining the degree of guilt." Our code provides that "no act committed by a person while in the state of voluntary intoxication, shall be deemed less criminal by reason of his having been in such condition; but whenever the actual existence of any particular motive, purpose, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." ( Hill's Code, § 1358.)   All the authorities agree that drunkenness is no excuse for crime.   But where, as in this state, and others with statutes which have degrees of murder and make deliberation and premeditation ingredients of the crime of murder in the first degree, the question of intent becomes a material fact, and evidence of intoxication is admissible and proper to be taken into consideration by the jury in determining the question as to premeditation and deliberation in murder of the first degree.   The defendant's intoxication is submitted to the jury simply for the purpose of showing a want of premeditation.

In *Farrell* v. *State*, 43 Tex. 508, the court says: "The correct rule upon this subject is, that although drunkenness neither aggravates nor excuses an act done by a party while under the influence, still it is a fact which may affect both physical ability and mental condition, and may be essential in determining the nature and character of the acts of the defendant, as well as the purpose and intention

with which they are done." The fact of intoxication is not admitted as an excuse for the crime, but as a means of determining its degree, when a question arises as to the particular state of mind of the accused at the time when he committed a crime. In other words, the fact of intoxication is to be submitted to the jury with the other facts in the case, for the purpose of enabling them to determine the intent of the accused in committing the act. (*People* v. *Williams*, 43 Cal. 344; *State* v. *Bell*, 29 Iowa, 316; *Nichols* v. *State*, 8 Ohio St. 435; *State* v. *Mahn*, 25 Kan. 182; *Haile* v. *State*, 11 Humph. 154; *Golden* v. *State*, 25 Ga. 527; 4 Am. & Eng. Ency. Law, 705.)

The evidence in this case showed that the defendant was intoxicated when he left Walla Walla, and that he had been drinking heavily, off and on, for two weeks. All the facts in respect to his conduct while he was at his home during the day, and shortly after he shot his wife in the evening, were fully detailed to the jury. The substance of the facts we have set out. If it be true that the defendant was intoxicated at the time he shot his wife, the trial court fully met that aspect of the case when it charged the jury that the fact of intoxication should be considered with the other facts in determining the degree of guilt; that while drunkenness of itself could not avail as a defense, yet it should be considered upon the question whether the defendant committed the act with deliberation and premeditation. On the other hand, if the defendant was laboring under temporary insanity as the result of intoxication, or delirium tremens from the excessive use of strong drink, so as to render him incapable of understanding the nature and consequences of the act which he committed, the trial court fully met this aspect of his defense, and charged the jury that if they were satisfied at the time the defendant committed the act he was laboring under such a defect of reason, or derangement of mind as not to know the nature, quality, and consequences of the act he was doing,—in a

word, that if he did not understand when he shot his wife that he was doing wrong,—the jury must acquit him. It seems to us, in the light of the evidence, that the trial court covered by its instructions every ground upon which the defendant could rest his defense, and that there was no error in refusing the instructions asked.

In view of the sacredness of life, and the protection which the law throws about it, we have examined carefully the evidence and the instructions given by the trial court, so as to guard against any liability to error, and to give the defendant every benefit and advantage the law affords, and the result of our deliberation is, that we find no error, and that the judgment must be affirmed.