Argued 20 February; decided 27 February, 1899.

## STATE v. BRANTON.

[56 Pac. 267]

1.  INDICTMENT—PRINCIPAL AND ACCESSORY.—Under Hill's Ann. Laws, §§ 1289, 2011, abrogating the distinction betweens principals and accessories, and providing that all persons, whether committing a crime or aiding and abetting in its commission, shall be indicted and tried as principals, the conviction of one person charged as principal in the commission of a crime does not operate as an acquittal of another separately charged as principal in the commission of the same crime: *State* v. *Kirk*, 10 Or. 505; *State* v. *Moran*, 15 Or. 262, and *State* v. *Steeves*, 29 Or. 85, cited.

2.  CONSTITUTIONAL RIGHT OF ACCUSED—INDICTMENT.—The guaranty to an accused person by the Oregon constitution, article I, § 11, of the right to demand the nature and cause of the accusation against him is not infringed by charging an accessory before a crime as though he had directly committed the criminal act: *State* v. *Steeves*, 29 Or. 85, approved.

3.  VENUE—EVIDENCE OF LOCATION.—The exact location of the boundary line between two counties is immaterial upon the question whether a crime was committed in the county in which the indictment was found, where any location of the boundary line that is claimed would place the scene of the crime in the county in which the indictment was found.

4.  SUFFICIENCY OF EVIDENCE.—The testimony in this case is such as to require the case to be submitted to the jury, and a motion to direct an acquittal was properly overruled.

5.  EVIDENCE—ACCOMPLICE—Under Hill's Ann. Laws, §§ 1289, 2011, abrogating the distinction between principals and accessories, and providing that an accomplice may be indicted and tried as a principal, evidence that defendant was an accomplice is sufficient to sustain a conviction under an indictment charging him as a principal.

6.  CHARGE TO JURY—It is not error to refuse requests for special charges, the substance of which was given in the general charge.

7.  INCONSISTENT INSTRUCTIONS — A defendant cannot complain that charges are contradictory when he asked for them.

8. WHEN CHARGE ON INSANITY MAY BE GIVEN — An instruction on insanity is justified when defendant offers testimony tending to show that he was insane, although there was no such plea. Under the Oregon statutes a plea of insanity is inadmissible, but such defense is interposed whenever the defendant introduces testimony tending to show the state of his mind when the crime with which he was charged was committed.

From Lane : J. W. HAMILTON, Judge.

The defendant, Claude Branton, was convicted of the crime of murder in the first degree, alleged to have been committed in Lane County, June 15, 1898, by killing one John A. Linn, and, having been sentenced to be hanged, he appeals, assigning as error the action of the trial court in denying him leave to withdraw his plea of not guilty to enable him to demur to the indictment, in refusing to direct the jury to acquit him, and in giving certain instructions. The defendant pleaded not guilty when arraigned, and thereafter, but before he was tried, one Courtland Green was separately indicted for the crime of murder in the first degree, alleged to have been committed by killing the same person, to which he entered a plea of guilty, whereupon defendant moved the court for leave to withdraw his plea so that he might demur to the indictment returned against him, but, the motion being overruled, an exception was saved.

AFFIRMED.

For appellant there was an oral argument by *Mr. W. C. Hale*, and a brief urging these points :

It is earnestly contended that, under the form of these two indictments, the plea of guilty entered by Green operated as an acquittal of defendant Branton of the alleged crime of murdering John A. Linn, or, in other words, it operated as a complete vindication of the law for the commission of the single crime charged separately against this defendant and Green, and therefore

the state could proceed no further in the prosecution of this single charge of crime after a verdict or plea of guilty was entered against any person separately charged with the full commission of said crime. Such was the rule at common law, and our statute has not changed the rule in this state under the facts of this case. The statute, §§ 1289 and 2011, has provided that all persons concerned in the commission of a crime are principals, and shall be indicted, tried and punished as such. Under these statutes, either indictment for the crime charged, on the point that each was separately charged as a principal without reference to the other, was good as against the person first convicted of the crime charged; but after the plea of guilty entered by Green and accepted by the court, the prosecution of the defendant was ended, the law satisfied and the entire case closed as to the defendant.

Now, if Green killed Linn, and he pleaded guilty to the indictment charging him singly with the full and complete crime of murdering Linn, then of course in the eyes of the law this defendant could not have killed Linn. If one man kills another and is convicted of the crime by plea or verdict of guilty it is absurd to say in a court of law that still another person killed deceased, while the plea or verdict of guilty stands of record. Under the record in this case and the indictment against Green, it was the duty of the court to grant the defendant's motion to withdraw his plea of not guilty and demur to the indictment against him. Had this been done, then the court could have properly passed upon this question and given the defendant the right granted by the constitution by resubmitting the case to the grand jury for an indictment stating " the nature and cause of the accusation against him." The nature of the accusation would be the part he acted in the alleged crime, if

any, and the " cause " of the accusation would be that the defendant did, in some manner, aid, assist or abet Green in the crime of killing Linn, making him a principal under sections 1289 and 2011, or facts making him an accessory after the fact, under section 2012. This is a legal and constitutional right, and its refusal was an error materially affecting the substantial rights of the defendant. ,

The point here made has never been adjudicated by this court, and is open for a full and fair consideration and adjudication. In *State* v. *Kirk*, 10 Or. 505, and in *State* v. *Steeves*, 29 Or. 85, the various sections of the statute were considered and construed in reference to these particular cases, but it must be borne in mind that in each of these cases the parties concerned were jointly indicted with others, and hence the indictment was full notice and specification of the appellant's participation in the crime charged, and therefore not decisive of the point raised in this case. In *State* v. *Moran*, 15 Or. 262, Dan Moran and one James Kelley were separately indicted for the murder of one Kaluscha. Kelley was first put on trial and acquitted, and thereafter Moran was tried and convicted, and appealed from the judgment of conviction, which was affirmed. This decision is in no way decisive of the question raised in the present case, for the reason that Moran was the first and only person convicted in that case.

The court erred in denying defendant's motion for a new trial on the ground of the insufficiency of the evidence to support a verdict of guilty. The only evidence introduced that defendant killed Linn is the evidence of Green. Before defendant was put on trial Green pleaded guilty of murder in the first degree for killing the same person, John A. Linn. By some means, springing from some cause, and in disregard of section 1403, Hill's Code,

he escaped the death penalty and was given that of life imprisonment. This man Green, represented by counsel throughout, goes upon the witness stand with his plea of murdering Linn fresh from his mouth, and, against objection, solemnly swears that he did not kill Linn, but that the defendant killed him. This fact alone would cause a prudent man to hesitate before believing him. To show that Green's evidence was false and absolutely unworthy of belief, it is only necessary to briefly notice a few of his untruths uttered against the defendant in Green's attempt to hurl the defendant into eternity for his (Green's) own confessed crime, to save himself from like fate. * * * Take this evidence of Green in connection with the motion of the district attorney and his associate, which shows on its face that immunity was promised Green by the state, and the logical conclusion of any fair mind must be that Green entered his plea under an assurance of safety from the gallows, and that the state in its zeal to hang some one became at least a passive party to the scheme, with a willingness born of desire.

For the state there was an oral argument by *Messrs. D. R. N. Blackburn,* attorney-general, *George M. Brown,* district attorney, and *L. T. Harris,* with a brief urging this point.

. The appellant, Claude Branton, was severally indicted by the grand jury of Lane County, Oregon, on the 26th day of October, 1898, charged with the crime of murder in the first degree by killing John A. Linn on the 15th day of June, 1898, in said Lane County. On the day that the indictment was returned into court, the defendant was arraigned, entered his plea of not guilty the following day, and thereafter was duly convicted of mur-

der in the first degree as charged in the indictment, and
was sentenced according to law.    There was no reference
to the complicity of Branton or any one else in the com-
mission of Green's crime, contained in said indictment
by innuendo òr otherwise.    Each separate indictment
contained the statement of a complete crime charged
against each of the defendants.    The theory of the prose-
cution was, and it is borne out by the evidence in the
record, that Branton and Green were both actually pres-
ent, aiding and abetting each other in the commission of
the criminal act of killing Linn ; that the criminal act
that took the life of the deceased was in law the act of
each individually as well as of both ; that the distinction
between principal in the first and second degree has not
only been abolished by statute in this state, but had been
recognized as a distinction without a difference in prac-
tice prior to the adoption of the constitution everywhere
in this country, excepting in a few states having statutes
recognizing a distinction.

The contention of the state was and still is that mur-
der, unlike riot, is a several crime ; that in a crime like
murder the criminal can be indicted alone, tried alone,
and the full penalty be inflicted on him the same as
though he committed the crime unaided ; that a crim-
inal action is unlike a civil action.    The defendant in a
criminal matter cannot be heard to say that another
wrongdoer has met his obligation.    The guilt of one is
neither mitigated nor enhanced from the fact that an-
other may be also guilty.    The purpose of the civil suit
is to compel the defendant to compensate the plaintiff
for what he has unjustly suffered, while that of the
criminal is punishment, and the cure of a public wrong.
Therefore, in a civil case, however numerous the wrong-
doers, the plaintiff is to be remunerated for his suffer-
ings only once ; in a criminal one, where each is as

guilty as though the other were not guilty also, and nothing is for pay but all is for punishment, the full penalty is to be inflicted on each the same as though he had committed the crime unaided. The law may proceed precisely as though he were the only participant in the act.

The only pleading by a defendant is either a demurrer or a plea. Of pleas there are these : Guilty, not guilty, former conviction or acquittal. Of demurrers there are five, and the causes of them must appear on the face of the indictment. Now the indictment does not state that Green had pleaded guilty, and there is no provision for such a plea, from which it would seem that the statutes of Oregon do not contemplate that it shall be a defense for the defendant to plead that some other fellow has been convicted or acquitted of the crime charged ; the only plea is, has the defendant himself been convicted or acquitted of that crime.

MR. JUSTICE MOORE, after stating the facts, delivered the opinion of the court.

1. It is contended by defendant's counsel that under the form of these indictments Green's plea of guilty was a complete vindication of the law for the commission of the single crime with which he and Branton were separately charged, and operated as an acquittal of the latter, and that the court therefore erred in refusing to permit him to withdraw his plea. By sections 1289 and 2011, Hill's Ann. Laws, passed in 1864, it is provided that " the distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the crime, or

aid and abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in case of a misdemeanor;" and that " all persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the crime, or aid and abet in its commission, though not present, are principals, and to be tried and punished as such." There appears to be no question as to the form of the indictments under these provisions, or their sufficiency to support a judgment against the party first convicted thereunder; but it is urged that, after Green's plea had been accepted, the law's demands were fully satisfied, which precluded the state from further proceeding against defendant under the form of indictment which it adopted; and that, if it sought to charge him separately as an accomplice, he was entitled, under the organic law of the state, "to demand the nature and cause of the accusation against him :" Const. Or. art. I, § 11.

This court has held that an indictment which charged as principal a party whom the state sought to prove was present aiding and abetting, or who counseled and procured another to commit, a felony, was not violative of the clause of the constitution relied upon (*State* v. *Kirk*, 10 Or. 505; *State* v. *Steeves*, 29 Or. 85, 43 Pac. 947); but it is insisted that neither of these cases is decisive of the question under consideration, for in each instance the party sought to be convicted as an accessory was jointly indicted with his alleged principal. So, too, in *State* v. *Moran*, 15 Or. 262 (14 Pac. 419), it was held that an indictment charging an accomplice as principal did not violate the fundamental law of the state; but it is maintained that the decision in that case is not controlling in this, for there the alleged principal had been acquitted before the accessory was tried. Where more than one

join in the commission of an offense which is not necessarily several, all or any number of them may be jointly or separately indicted therefor. Wharton Cr. Pl. (8th Ed.) § 301 ; Bishop New Cr. Proc. § 463 ; *State* v. *O'Brien*, 18 R. I. 105 (25 Atl. 910). " We take the general rule to be," say the court in *Commonwealth* v. *Griffin*, 3 Cush. 523, "that in every indictment against two or more the charge is several as well as joint,—in effect, that each is guilty of the offense charged ; so that, if one is found guilty, judgment may be passed on him, although one or more may be acquitted." To the same effect, see, also, *Commonwealth* v. *Brown*, 12 Gray, 135. So, too, a joint indictment against all who participate in the commission of a crime is, in effect, a several indictment against each. *State* v. *O'Brien*, 18 R. I. 105 (25 Atl. 105).

2.   Defendant's counsel, in support of the point contended for, rely upon the case of *State* v. *Gifford*, 53 Pac. 709, in which it was held by the supreme court of Washington, under a clause of the constitution of that state (section 22, article I) identical with ours, that an information charging defendant as principal with the commission of the crime of rape is not supported by evidence that he was an accessory before the fact, and that, notwithstanding the Code of that state (section 1189) abrogates the distinction between an accessory before the fact and a principal, the information was in contravention of the organic law of the state, which provides that the accused shall have the right to demand the nature and cause of the accusation against him. It would seem that the decision in that case, without referring thereto, has been virtually reversed by the more recent case of *State* v. *Webb*, 55 Pac. 935, in which Mr. Justice REAVIS, speaking for the court, says : " Defendant also urges that the information

charges the defendant with the crime of robbery as a principal, and that the evidence of the prosecuting witness shows that the defendant could only be guilty of that of principal of the second degree. It is a sufficient answer to this contention to state that the distinction between accessories and principals in the first and second degree is abolished: 2 Ballinger's Ann. Codes & Stat. § 6782 (2 Hill's Code, § 1189). And there was no material variation between the information and the proof. Defendant was charged as principal, and was convicted as such." In *State* v. *Geddes*, 55 Pac. 919, the supreme court of Montana criticise the decision relied upon, and hold that a clause of the constitution of that state which guarantees to the accused the right to demand the nature and cause of the accusation (Const. Mont. article III, § 16) is not violated by an indictment which charges the defendant as principal, under an act of the legislative assembly which provides that persons aiding and abetting a crime, although not present, must be prosecuted as principals, "and no other facts need be alleged in any indictment or information against such an accessory than are required in an indictment or information against his principal," when the person so accused was not present at the commission of the offense. True, the defendant in that case was jointly indicted with others, but, since a joint indictment is equivalent to a several indictment against each, it must follow that several indictments charging different parties with the commission of the same offense is tantamount to a joint indictment against all. We conclude from the foregoing that a demurrer upon the ground stated would be without merit, and could not be rightfully sustained, and, this being so, the defendant was not deprived of any substantial right by the court's refusal to permit him to withdraw his plea.

3.   It is maintained that the court erred in refusing to direct the jury to acquit defendant, because the proof failed to show that the crime was committed in Lane County.   The testimony tends to show that Linn was killed at Isham's Corral, a point on the road leading from Sisters, in Crook, to McKenzie River, in Lane County, about four miles west of the summit of the Cascade Mountains.   It is urged that the boundary between Crook and Lane Counties has not been designated by the legislative assembly, and that it is therefore impossible to say whether the crime was committed in the county in which defendant was tried.   Lane County was created January 28, 1851, by an act which provided:   "That all that portion of Oregon Territory lying south of Linn County, and south of so much of Benton County as is east of Umpqua County, be, and the same is hereby created and organized into a separate county, by the name of Lane County."   Statutes of a Local Nature of Oregon, 1851, p. 32; Hill's Ann. Laws, § 2267.   Linn County, to which reference is made, was described by referring to another county as follows:   "Section 1. That the southern boundary of Champoeg County be located in the following manner:   Commencing in the middle of the channel of the Willamette River, opposite the mouth of the Santiam River, thence up said river to the north fork; thence up said fork to the Cascade Mountains; thence due east to the summit of the Rocky Mountains.   Section 2.   Be it enacted:   That all that portion of Oregon Territory lying south of Champoeg and east of Benton County be and the same is hereby called Linn County,"—approved December 28, 1847. Laws of General and Local Nature, Collected and Published Pursuant to an act of the Legislative Assembly Passed January 26, 1853, p. 55.   It will thus be seen that the eastern boundary of Lane County as originally

established was the summit of the Rocky Mountains.
A portion of Lane County was thereafter included within
Wasco County, the boundary of which was originally
given as follows :   " That so much of the said Territory
of Oregon as is bounded as follows, to-wit : Commencing
at the cascades of the Columbia River, thence running
up said river to the point where the southern shore of
said river is intersected by the southern boundary of
Washington Territory, thence east along said boundary
to the eastern boundary of Oregon Territory ; thence
southerly along the eastern boundary of said territory
to the southern boundary of the same, thence west along
said southern boundary to the Cascade Mountains,
thence northerly along said range of mountains to the
place of beginning, be and the same is hereby created
and organized into a separate county, to be called Wasco
County,"—passed January 11, 1854.   Special Laws
Passed by the Legislative Assembly of the Territory of
Oregon at the Fifth Regular Session Thereof, p. 26 ;
Hill's Ann. Laws, § 2283.

It will be seen that a doubt exists as to the original
location of the western boundary of Wasco County, but
the legislative assembly undoubtedly understood that it
extended to the summit of the Cascade Range, for an
act passed by that body December 22, 1853, defining the
southern boundary of Lane County, reads as follows :
"That the southern boundary of Lane County shall be
located as follows : Commencing on the Pacific Coast, at
the mouth of the Siuslaw, on the south bank, thence fol-
lowing up the south bank of said stream, to a point fif-
teen miles west of the main traveled road, known by the
name of the Applegate Road, thence southerly to the
summit of the Calapooia Mountains, thence eastward
along the summit of said mountains to the summit of
the Cascade Range " : Sp. Laws, p. 13.   The southern

boundary so established is almost identical with the line
as located by the act of November 19, 1885 (Hill's Ann.
Laws Or., § 2268). It will be seen that the southern
boundary of Lane County was located twenty days prior
to the establishment of Wasco County, but both measures
were probably under consideration by the legislative
assembly when the former act was passed. Crook
County was established February 22, 1885, and its
boundaries defined by beginning at a certain point on
the western boundary of Wasco County, and running
thence by certain courses to a point designated as the
southeast corner of the newly-organized county; "thence
due west to the east line of Lane County; thence along
the east line of Lane and Linn Counties to the place of
beginning": Hill's Ann. Laws, § 2254. Whether the
boundary line between Crook and Lane Counties runs
along the said east line or along the summit of the Cas-
cade range of mountains, the crime was committed
within the latter county, and hence the court had juris-
diction of the action.

4. It is contended that no testimony was introduced
at the trial tending to prove defendant's participation in
the killing, except that of Courtland Green, who testified
that Branton shot deceased while he was asleep, and, he
being a confessed accomplice, and his evidence not hav-
ing been corroborated in any manner, the court erred in
refusing to direct the jury to acquit the defendant. The
defense was conducted upon the theory that Green did
the killing without the knowledge or intent of Branton,
who became an accessory after the fact only by the part
he took in attempting to shield the principal from the
consequences of his act. The defendant, appearing as a
witness in his own behalf, testified that about two or
three days prior to the time he and Green left the Wil-

33 OR.—35.

lamette Valley to go to Gilliam County—March 13, 1898
—the latter, speaking in relation to the prospect of form-
ing a partnership with Linn in raising horses, expressed
an intention of killing the deceased ; the witness, in an-
swer to the question, ''You may state what conversation
you ever had with Mr. Green, if any, touching the matter
of any injury or evil intentions towards Linn, and when
and where they were,'' saying : ''The first he wanted to
go in with Linn. He said, 'If you will get in with Mr.
Linn, we will get away with him after a while.' I asked
him what he meant. He said, 'The old man may not
look any better, but he will be better off.' '' He also
testified that, after having arrived at their destination,
Green said to him : '' 'I won't stand this Eastern Oregon
dust any longer, and only work for $15. I want a horse,
and, if this one wasn't branded, I would take this.' He
wanted a horse, and, if he could get out with Linn, and
drive over there, and do him up. 'Do you mean to do
that?' He said, 'Do you suppose I could get this horse?'
I did not believe he had any such intention before I left
there.' '' Defendant, in speaking of what Green said to
him about Linn, just before leaving for the Willamette
valley, says : ''He said : ' Would there be any harm in
putting the old man away? He would be better off.' I
said, 'Courty, do you mean that?' He said, 'No, I
don't.' I said, 'The old man is well known, and it is
out of the question.' He said, 'Of course it is.' ''

The witness also says, in substance, that on June 6,
1898, he and Green left Condon, with Linn, who was
driving a band of horses, seeking to obtain better pasture
for them, and expecting to find it in Crook County; that,
having reached said county, they persuaded Linn to
drive his horses west of the mountains, and, having
reached Isham's Corral, near the summit, on June 15,
they camped for the night, and, while Linn was sleeping

by the fire, Green shot him as the witness was approaching the camp with a pail of water; that Green thereupon placed the body of his victim upon the fire, and helped to procure fuel, but the next morning, the bones not being entirely consumed, he aided Green in breaking them with an ax, and buried the pieces beneath a rock, where they were found, and recognized as human bones; that Green took Linn's money, and other valuables, and, after having left the scene, gave the money to the witness, who, in order to protect Green, tried to personate Linn by making whiskers from the hair of a horse's mane, which he wore at night as he called upon a person with whom he left the horses to be pastured, and to whom he represented that his name was John Linn. The evidence of other witnesses also shows that defendant tried to persuade several persons to testify that they had seen Linn west of the Cascade Mountains, offering them various sums of money; and telling others that they could have their choice from the band of horses which he and Green were driving if they would testify that they bought them from a man whom he described as about 40 or 45 years old, having sandy hair and red whiskers, stating that they need have no fear of being contradicted in their testimony, as the person so described would never appear against them; and also urged the persons whom he solicited to testify in his behalf not to say anything about his proposal, as he had got into trouble which might cost him his life.   Branton's own admissions corroborate the testimony of Green so far as the killing of Linn is concerned, and he must have known the intention of the principal long before the crime was committed.   Whether he fired the fatal shot was a question for the jury, under all the circumstances surrounding the case, and hence the court com-

mitted no error in refusing to direct a verdict of acquittal on this ground.

5. The defendant asked the court to give the following instruction: "I instruct you that it is incumbent upon the state to show by proof beyond a reasonable doubt that the deceased came to his death at the hands of the defendant. The state must show not only that the injury inflicted upon the deceased by the defendant, if any, was the probable cause of the death of the deceased, but that it was the immediate and efficient cause of his death ; and the evidence must establish this fact to your satisfaction beyond a reasonable doubt, and, if this has not been done, then you must find the defendant not guilty,"—which was given with the following qualification: "That if the defendant was acting, aiding, and assisting in the commission of the criminal act of killing, if any such act was committed, and all the elements exist to sustain the crime of murder in the first degree, then any doubt as to the fact of which of two persons, the defendant or an accomplice, inflicted the mortal injury, would not be such a fact or doubt as would avail the defendant. You are to consider whether or not this crime, or any degree of it, has been committed by the defendant, though his part may have been aiding, assisting, and abetting the other in the act, under the instructions I have given you." An exception having been taken, it is insisted that the court erred in accompanying the instruction with this qualification. The exception is undoubtedly based upon the theory that evidence of defendant's complicity, as an accomplice, in the commission of the crime, was inadmissible under the form of the indictment, and, such being the case, the qualification was erroneous ; but, having held that the indictment properly charged the defendant as principal, no error was committed by the court in the respect complained of.

6. The court refused to give certain other instructions asked by the defendant, but, without quoting them, we think that such portions of them as were proper were substantially given in the general charge.

7. It is also insisted that certain other instructions are contradictory, but, inasmuch as they were given at defendant's request, he cannot complain of their inconsistency.

8. The defendant having introduced evidence to show that his mental condition was weak, that he was easily influenced by people whom he liked, that his memory was defective, that he had an aunt in the insane asylum, and an uncle and a cousin who were insane, the court, of its own motion, gave the following instruction : "Where the commission of the act charged as a crime is proven, and the defense sought to be established is the insanity of the defendant, the same must be proven beyond a reasonable doubt. If a party, notwithstanding some disease or infirmity, still has reason enough to know the act which he proposes to commit is wrong and unlawful, and knows its nature and quality, and has left the power of deliberation and premeditation, and the power to do or refrain from doing the act charged as · a crime, such mental disease will not avail as a defense. In other words, while the law will not punish a man for an act which is the result of, or produced by, mental weakness, it will punish him for an unlawful act, not the result of, or produced or influenced by, mental disease, even though some mental unsoundness is shown to have existed." An exception to that portion of the charge having been saved, it is contended that, inasmuch as no plea of insanity was interposed, the evidence introduced by the defendant upon that branch of the subject did not justify the court in giving it.

It is argued that this instruction assumed that de-

fendant killed the deceased, and left to the jury the consideration of only one question, namely, that of the defendant's mental condition at the moment the act was committed, and, the burden being cast upon him of proving his want of responsibility, the jury had no alternative but to find the verdict which was returned. The only pleading on the part of the defendant in a criminal action is either a demurrer or a plea: Hill's Ann. Laws, § 1320. Pleas to an indictment are of three kinds: (1) Guilty, (2) not guilty, and (3) a judgment of former conviction or acquittal: Id. § 1331. All matters of fact tending to establish a defense to the charge specified in the indictment, other than those specified in said third subdivision, may be given in evidence under the plea of not guilty: Id. § 1336. If the defense be the insanity of the defendant, the jury must be instructed, if they find him not guilty on that ground, to state that fact in their verdict: Id. § 1389. It will be seen from these excerpts that under our statute a plea of insanity is inadmissible, but that a defense of that character is interposed whenever the defendant introduces in evidence testimony tending to show the state of his mind when the crime with which he is charged was committed. Such testimony is rarely offered, however, unless the evidence produced by the state tends to prove that the defendant was present at, or participated in, the commission of the offense. In the case at bar, defendant admitted, when on the stand as a witness, that he was present when Linn was shot, and that he helped Green procure fuel to burn his body. After these admissions had been made, it was sought to counteract their very damaging effect by introducing testimony showing defendant's tendency to mental alienation resulting from a pre-existing cause, and, such testimony having been introduced, it was incumbent upon the

court to instruct the jury in relation to their verdict, and, the court having discharged its duty in this respect, no error was committed in giving the instruction complained of, and hence the judgment is affirmed.

AFFIRMED.

Decided at PENDLETON, 13 August, 1898.