Argued February 20; affirmed March 20; rehearing denied
April 24, 1934

## STATE *v.* RILEY

(30 P. (2d) 1041)

*H. V. Schmalz, A. M. Hodler,* and *Pat H. Donegan,* all of Burns, for appellant.

*J. S. Cook,* District Attorney, of Burns (V. G. Cozad, of Burns, on the brief), for the State.

CAMPBELL, J.  On Monday, October 31, 1932, defendant shot and killed his wife, Hilda Riley, at Burns in Harney county, Oregon. He was indicted, tried and convicted of murder in the first degree and sentence of death pronounced. Defendant appeals.

The record discloses that appellant was married to Hilda Riley, the deceased, in June, 1924. The issue of the marriage was two children. It appears that they had some marital difficulties and finally, in the latter part of September, 1932, deceased left appellant and returned to her parents' home in Burns, Harney county, Oregon. At the time she left appellant, they were living in Portland. Shortly after her return to Harney county, deceased filed a suit for divorce from appellant, which suit was still pending at the time of the homicide. After deceased left appellant, she received some letters from him. The tone of the letters were rather threatening. On October 3, 1932, he wrote

her in quite scathing terms as to her conduct and her disregard for her household duties. He accused her of being unfaithful to him. His letter continues, "You will remember that I told you that I had been married before and had a wife that was untrue to me and we separated and I told you what I would do to another who would be untrue to me again, and you married me on those conditions. Now you have been a little untrue to me and have been several times." And again: "This letter may not set very well and you may not want to come to terms but you are going to anyway and like it. Don't try any funny business and disregard this letter because God help you if you do. I mean every word of what I am saying." He wrote another letter to the same effect, asserting her unfitness as a mother and accusing her of being unfaithful.

On October 25, 1932, deceased wrote him telling him, "After thinking it all over and after the letter you have written * * * I am sorry but we could never patch things up again." She further advised him not to come to Burns, "it would be no use". However, on October 28th, defendant arrived at Burns. On that evening, he called at the residence of his wife's father and mother, Mr. Carey Thornburg and Mrs. Rose Thornburg, and visited with his children for two or three hours. While he was in Burns, he stopped at the Leavens hotel. He again visited the Thornburg family on Saturday, also on Sunday. On Monday morning, October 31st, he again came to the Thornburg home early in the morning. Mr. and Mrs. Thornburg and some of the children were in the kitchen. His wife's sister, Delta, was still in bed. He and his wife talked in what they called the living room for some time, and then both got up and went into the kitchen where he informed Mr. and Mrs. Thornburg that Hilda, his

wife, was going back to Portland with him. His wife's mother said, "Is that so Hilda?" Hilda answered, "Yes, I guess I will have to." Mr. Carey Thornburg, her father, thereupon said, "You don't have to go if you don't want to." Hilda then requested the defendant to sit down which he refused to do. She then said, "Run, he's got a gun." Immediately thereafter defendant started to take a gun out of his pocket and the evidence would seem to indicate that the first shot was fired before the gun was entirely out of his pocket. He fired a shot at Mr. Thornburg which punctured his neck, paralyzing him, causing him to remain standing in one position. The evidence is somewhat confusing as to what took place thereafter. The defendant claims that his mind, for some time thereafter, was a blank. The witnesses for the state testified that he tried to shoot the girl Delta and fired two or three shots at her as she ran up the street. He then appeared at the door leading from the kitchen to the bathroom and shot Mr. Thornburg, who was still standing in the kitchen, a second time and killed him. He then shot Mrs. Thornburg, wounding her in the breast. His wife got out of the house and appellant saw her and chased her around the woodshed and in through the woodshed door where he shot her, three bullets taking effect near the heart. He then carried her out and laid her on the lawn. His own testimony was that Mrs. Thornburg came to the door and said "Oh my God, Harry, how could you do such a thing?" and he answered by saying, "It looks to me that you had a lot to do with this yourself." He then fired a couple of more shots at Mrs. Thornburg, wounding her each time. He then picked up his wife, carried her to the automobile and drove immediately to the hospital and called for a doctor. He told the attendants at the hospital that his

wife was shot and that he did it. His wife died on the emergency table in the hospital before the doctors could do anything to help her and within a very short time after her arrival there.

The Thornburg family is an old pioneer family of Harney county, apparently well-respected, and had a great many friends throughout the county.

The appellant assigns as error the refusal of the court to grant a change of venue on appellant's motion and in overruling defendant's objection to the introduction of evidence because the jury was improperly selected.

■■ The motion for a change of venue is based on the joint affidavit of defendant's attorneys only. In their affidavit they complain that there are prejudices existing among the voters of Harney county against the defendant and that an impartial jury could not be found to grant an impartial trial to defendant. They further allege that an undue number of the jurors, selected by the county court and placed on the jury list, were drawn from the vicinity of the town of Burns where the homicide occurred and that the list of jurors was not evenly distributed throughout the county in accordance with the registration of voters. He makes no charge of fraud on the part of any one connected with the making of the list or drawing the jury. However, a jury was selected which properly qualified as such. Eleven of the jurors in the box defendant did not challenge. He did not attempt to exercise a challenge for cause or a peremptory challenge against any one of them. The twelfth juror qualified as to any challenge that might have been exercised against him for cause. He said that, some thirty years prior to being selected as a juror, he had worked for a short

time for Carey Thornburg in the hayfield, that he had no trouble with him; that their relations thereafter had been friendly. He also testified that he had heard the case discussed to a limited extent; that he knew of it; that he had formed no opinion, and had none at the time he was selected as to the guilt or innocence of defendant; also that, if the evidence was sufficient to satisfy his mind beyond a reasonable doubt of defendant's guilt, he would return a verdict of guilty and that he knew of no reason that would prevent him from trying the cause fairly and impartially. Also that he would lean neither one way nor the other on account of any acquaintance he might have had with the Thornburgs. The defendant showed no reason why the juror was in any way disqualified, and, as he had already exhausted his peremptory challenges, he was not entitled nor did he attempt to so challenge the juror.

Defendant's counsel excused the lack of further affidavits by saying that they "had been unable to secure, although they have diligently tried, affidavits to that effect from responsible people for the reason that they [people] may be injured in their business or social relations with members of the family [Thornburg] in its various ramifications".

In opposition to the motion for a change of venue the state filed the affidavits of the Hon. R. J. Williams, county judge, L. B. Hayes and H. A. Withers, county commissioners, and S. W. Frazer, sheriff of Harney county, to the effect that on the day of the homicide there was considerable excitement around Burns yet none of the affiants heard of any threats of violence against defendant, and from the contacts and conversations they had had with the public the

affiants believed that a fair and impartial jury could be secured and that defendant would obtain a fair and impartial trial in Harney county.

■ The application for a change of venue is addressed to the sound discretion of the court and his action thereon will not be disturbed unless there is an abuse of such discretion. This question has been many times before this court, our latest expression thereon being in *State v. Kingsley,* 137 Or. 305 (2 P. (2d) 3, 3 P. (2d) 113).

The Constitution of Oregon provides: "The legislative assembly shall so provide that the most competent of the permanent citizens of the county shall be chosen for jurors; * * *": Oregon Constitution, Art. VII, § 5 (18).

The statute, Oregon Code 1930, § 30-201, provides that the county court shall, at its first or second term of each year, make a jury list of persons having the qualifications of jurors. This list shall be taken from the latest tax roll and registration books of the county.

"The jury list shall contain the names of at least two hundred (200) persons * * * of qualified jurors on the assessment roll or the registration books * * *. The names entered upon the jury list shall be selected from the different portions of the county in proportion to the number of names of qualified jurors appearing on the assessment roll and registration books, as far as practicable; * * *." Id., 30-203. "The county clerk shall keep in his office a sufficient box, carefully secured, which is denominated the jury box. On receiving the jury list, he shall * * * prepare and deposit in such box separate ballots containing the name, place of residence, and occupation of each person embraced in the list, and folded as nearly alike as practicable, and so that the names can not be seen." Id., 30-205.

The jurors for each term of the circuit court shall be drawn from the names in the jury box, Id., 30-301, to the number of thirty-one, Id., 30-302, at the clerk's office, not less than ten nor more than twenty days before the beginning of the term of court at which they are to serve, Id., 30-303, by the county clerk who shall call to his assistance therefor either the sheriff or a justice of the peace of the county and shall publicly draw out of the box as many ballots as there are jurors required: Id., 30-304. And whenever the regular panel of jurors so summoned becomes exhausted, or whenever, in the opinion of the court, the regular panel is likely to become exhausted for any reason, the court shall order an additional number of jurors to be drawn from the jury list: Id., 30-312. No challenge shall be made or allowed to the panel: Id., 2-202; *State v. Dale*, 8 Or. 229.

It will be observed that there are two sources from which the county court shall select the jury list—the tax roll and the registration books. The list is to be selected from the different portions, not precincts, of the county.

The jurors in the instant case were obtained by the method laid down in the statute. The court did not abuse its discretion in refusing to grant a change of venue.

■ During the trial, Rose Thornburg, the mother of the deceased, was called as a witness on the part of the state and, while testifying, exhibited to the jury her hand which had the thumb amputated by reason of the wound received at the time of the homicide. This is assigned as error.

The whole tragedy—the shooting of Mr. and Mrs. Thornburg and of Hilda Riley—was part of one con-

tinuous transaction occupying a very short space of time. It would be a difficult thing for the witness to take the stand without the jury seeing her hand and it would be equally difficult to have the witness testify to the wounding of her hand without exhibiting it to the jury. If the witness should testify to the loss of a thumb and at the same time conceal her hand, the jury might well conclude that the best evidence was not produced and the witness was unworthy of belief. The wounding of Mrs. Thornburg was a part of the *res gestae.*

■ Appellant assigns as error the court's action in overruling defendant's objection to the hypothetical question submitted to Dr. D. C. Burkes.

Dr. Burkes was called as a witness for the state and qualified as a duly licensed physician and surgeon and as an expert in psychiatry and neurology. He testified that he was present when State's Exhibits Nos. 7 and 8 (being letters written by defendant to Hilda Riley) had been introduced in evidence and read to the jury and that he remembered their contents; also that he was present practically all of the time while the witnesses for the defense, including defendant, were testifying and that he heard the testimony of all the witnesses for the defense regarding the character and peculiarities of defendant and also that he had the defendant under observation during the trial.

He was then asked: "Doctor, assuming the facts as to those peculiarities and traits and assuming the testimony of the witnesses on that subject to be the facts, * * *" (then follows a complete history of the actions of defendant in connection with the homicide as the same appeared in evidence). The question

then ended with: "Now Doctor, assuming that the statements of the above recited facts and in addition to such assumption, considering all of the testimony you have heard and the observations which you have made of the defendant during the trial, what is your opinion as to defendant's mind, as to his sanity?"

■ Taking into consideration that the doctor had the defendant under observation during the time defendant was in the courtroom and on the witness stand, and that he heard the witnesses testify as to the defendant's peculiar conduct and behavior, it would not be necessary to make a complete statement of such testimony in order that the expert might express an opinion. Counsel did not, by cross-examination, call to the attention of the court or witness any part of the question where any material fact or facts were omitted, or any part of the testimony relevant thereto, that the doctor might not have heard. The facts assumed were all germane to the sanity of the defendant. The actions of defendant, in connection with the matter about which the question of his sanity was raised, are certainly germane: *State v. Garrison,* 59 Or. 440 (117 P. 657).

■ One of the defenses suggested was that the defendant was insane at the time of the homicide. Appellant contends that the court erred in refusing to give appellant's requested instruction No. 1, as follows:

"In this cause the defendant has introduced evidence to the effect that he is mentally diseased. If you find beyond a reasonable doubt that by reason of the duress of such mental disease, he had so far lost the power to choose between the right and wrong, and to avoid doing the act charged in the indictment, as that his free agency was at the time destroyed,

and if, at the same time you further find that the alleged crime was so connected with such mental derangement, in the relation of cause and effect, as to have been the produce of such mental derangement solely, I instruct you that your verdict in this case should be not guilty by reason of insanity.''

The above instruction, requested by defendant, embodies the doctrine of irresistible impulse as a defense to criminal responsibility.

In *State v. Branton,* 33 Or. 533 (56 P. 267), the court charged the jury:

''If a party, notwithstanding some disease or infirmity, still has reason enough to know that the act which he proposes to commit is wrong and unlawful, and knows its nature and quality, and has left the power of deliberation and premeditation, *and the power to do or refrain from doing the act* charged as a crime, such mental disease will not avail as a defense.'' (Italics ours.)

This would seem to take into consideration the question of free agency of the defendant in connection with his powers of forbearance in relation to the act. This court held, on appeal, that such a charge was not error even though the latter part of the instruction intimates the charging of the irresistible impulse test. However, the instruction was not challenged upon that ground but on the ground that the instruction presupposed the commission of the crime by defendant. The irresistible impulse doctrine was definitely rejected in *State v. Hassing,* 60 Or. 81 (118 P. 195) and again in *State v. Grayson,* 126 Or. 560 (270 P. 404).

The test employed in Oregon to determine the criminal responsibility of the accused is known as the ''right or wrong'' test.

■ If the defendant has the "capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he did * * *" and "knowledge and consciousness that it was wrong and criminal and would subject him to punishment", he should not be acquitted on the grounds of insanity: *State v. Murray*, 11 Or. 413 (5 P. 55); *State v. Zorn*, 22 Or. 591 (30 P. 317).

"Insanity, to excuse crime, must be such as dethrones reason and renders the subject incapable of discerning right from wrong, or of understanding or appreciating the extent, nature, consequences, or effect of his wrongful act." State v. Lauth, 46 Or. 342 (80 P. 660, 114 Am. St. Rep. 873).

"In its legal sense, insanity is a defect or disease of the mind which renders a person incapable of entertaining a criminal intent. * * * After all is said, the test of legal insanity is this: Did the defendant at the time of the killing, * * * know what he was doing and that he was doing wrong? If he did know what he was doing and that it was wrong, he was legally sane and amenable to the law. If he did not know that what he was doing was wrong, he was legally insane, and is excused from the commission of the act, and in determining whether or not he was legally insane, you should accept the definition of legal insanity which the court has just given you." State v. Brumfield, 104 Or. 506 (209 P. 120).

In a later case, *State v. Butchek*, 121 Or. 141 (253 P. 367, 254 P. 805), this court declared: "The test of criminal responsibility adopted in this state is the power to discriminate between right and wrong."

This doctrine is derived from the opinion of the judges in the *M'Naghten's Case*, 10 Clark & Fin. 203 (England). However, it is not now followed in all of the states. See *Parsons v. State*, 81 Ala. 577 (2 So. 854, 60 Am. Rep. 193).

As early as 1834 and 1843, the irresistible impulse test, which is of American origin, was held necessary for criminal responsibility. In the first case, *State v. Thompson,* Wright's Ohio Rep. 617, the trial judge told the jury "That if the defendant at the time of the act could discriminate between right and wrong, and was conscious of the wrongfulness of the act, and had power to forbear or to do the act, he was responsible". In the second, (*Clark v. State,* 12 Ohio 483, 40 Am. Dec. 481), Judge Birchard told the jury that the test was:

"Was the accused a free agent in forming the purpose to kill? Was he, at the time the act was committed, capable of judging whether that act was right or wrong? And did he know at the time that it was an offense against the laws of God and man?" Insanity as a Defense in Criminal Law, Weihofen, (1933) 46, 47.

The irresistible impulse test has been adopted by the following states: Ohio, 1834; Massachusetts, 1844; Delaware, 1851; Kentucky, 1863; Iowa, 1868; Indiana, 1869; Maine, 1870; Tennessee, 1871; Connecticut, 1873; Michigan, 1878; Texas, 1880; Virginia, 1881; Wisconsin, 1883; Alabama, 1886; Arkansas, 1896; Vermont, 1901; New Mexico, 1910 (?); Colorado, 1915; Illinois, 1920; Washington, 1930 (?); Utah, 1931; and the United States Supreme Court, 1895. Insanity as a Defense in Criminal Law, Weihofen, pp. 66, 67.

The appellant contends that the irresistible impulse test is the more progressive and modern rule of determining criminal responsibility and that we are following a rule laid down one hundred years ago.

Mr. Weihofen, in his work "Insanity as a Defense in Criminal Law" heretofore quoted, answers the contentions of appellant that the irresistible impulse test is more modern than the rule laid down in *M'Naghten's*

*Case,* supra, and known as the right or wrong test, by saying:

"The answer is no. A review of the cases reveals no ground for saying that one view is more modern than the other, or that one is tending to give way to the other. All that can be said is that in the course of the past hundred years some seventeen American states have adopted the irresistible impulse test as an additional test of criminal irresponsibility, while most of the remaining states have adhered to knowledge of the wrongfulness of the act charged as the sole test. The presumption that the recognition of the volitional types of mental disorder as a defense to crime is a comparatively recent development, more to be looked for in recent than in older cases, is not borne out. Cases requiring will power to forbear doing the act as a necessary element for criminal responsibility can be found as early as 1834. (State v. Thompson, Wright's Ohio Rep. 617). The two most famous early decisions on the subject were decided in 1844 and 1846; (Comm. v. Rogers, 7 Metc. (MASS.) 500; Comm. v. Moser, 4 Pa. St. 264) both discussed at considerable length the necessity that the accused, to be punishable for crime, have freedom of will. To go back still further, in 1840, three years before M'Naghten's case (supra) Lord Denman in Regina v. Oxford (9 Car. & P. 525) instructed the jury that 'if some controlling disease' was the acting power within the defendant, 'which he could not resist', he would not be responsible. In short, the irresistible impulse test can be traced back at least as far as the rule in M'Naghten's Case.

If no distinction between the two rules can be made on the basis of their respective antiquity, neither can such distinction be made on the basis of their present-day popularity. There are as many cases adhering to the strict right and wrong test as there are those recognizing the irresistible impulse defense. Nor are the former limited to cases in which the courts felt bound by precedents. Since 1900, the question of the proper test of criminal responsibility, where the defendant

pleads insanity, has arisen for the first time in eight states. In only three of these did the court accept the irresistible impulse defense. (Vermont, 1901; Louisiana, 1904; Colorado, 1915. The Louisiana rule is not clear.) In the other five, knowledge of right and wrong with respect to the act charged was held the sole test of responsibility. (Florida, 1902; North Dakota, 1903, statute; Washington, 1909; Wyoming, 1915; Arizona, 1921.) During the same period (1900-1932), at least two states have overruled the previous decisions holding knowledge of right and wrong to be the sole test, and have adopted the irresistible impulse defense. (Illinois, 1920; Utah, 1931; and perhaps New Mexico, 1910); but during the same period, the reverse action was taken by at least five states which overruled previous cases in which irresistible impulse had been held a defense and adopted the stricter rule that only incapacity to know the wrongfulness of the act will serve to excuse the defendant. (Texas, 1900; Maine, 1901; Wisconsin, 1910; Iowa, 1928; Pennsylvania, 1931. And see People v. Marquis (1931) 344 Ill. 261, 176 N. E. 314, mentioning only knowledge of right and wrong as the test, although previous cases had expressly held irresistible impulse to be a defense.)'' Insanity as a Defense in Criminal Law, Weinhofen, pp. 65, 66.

■ In this state, under § 13-922, Oregon Code 1930, where the defense is insanity, the burden of proof always remains with the defendant, and the jury's finding on the question of reasonable doubt cannot be disturbed: *State v. Hansen,* 25 Or. 391 (35 P. 976, 36 P. 296) ; *State v. Davis,* 70 Or. 93 (140 P. 448).

■ Appellant made a motion for a new trial based principally on alleged misconduct on the part of some of the jurors in that such jurors did not truthfully disclose upon their *voir dire* examination their previous prejudices.

This motion is supported principally by the affidavit of J. C. DeShazor who was the thirteenth juror

in the case. In his affidavit he asserts that he heard several of the jurors say substantially, "Why go through with all of the humbug? This fellow killed a person in cold blood and should be promptly hanged without the foolishness of any trial." He further stated that the "jury at all times was intolerant, declined to listen to the evidence given by the defense or anything of benefit concerning the defendant". This latter part was merely affiant's conclusion. The judge on the bench, counsel for the state and the defendant, had just as much opportunity of observing whether the jurors were paying attention to defendant's evidence as the thirteenth juror and yet none of them calls to the attention of this court any such misconduct on the part of any of the jurors. His affidavit was flatly and totally contradicted by the affidavits of eleven of the jurors who sat in the case and also by the bailiffs appointed by the court to keep the jurors together and who were continually in the presence of the jurors.

Finding no error, the judgment of the circuit court will be affirmed. It is so ordered.