Argued January 30, affirmed March 20, motion to recall mandate denied July 24, 1923.

## STATE *v.* CASEY.

(213 Pac. 771; 217 Pac. 632.)

**Homicide—Competency of Dying Declaration for Court and Weight a Jury Question.**

1. The competency of a dying declaration is for the court, and its weight is for the jury.

**Homicide—Dying Declaration Competent as to Cause of Death.**

2. In a murder prosecution, it is competent to prove the declaration or act of deceased made or done under a sense of impending death respecting the cause of his death as provided by Section 727, subdivision 4, Or. L.

**Homicide—Declaration Made by Person Shot, Immediately After Shooting, Held Competent as Dying Declaration.**

3. In a prosecution for murder of a special police officer by defendant while attempting to rob a box-car, statements by deceased to his partner immediately after the shooting: "Herman, they hit me hard. They got me in the guts. My time is short. Get me to Brother Jackie, quick," and also: "They were two tall men. They were breaking into a box-car. I asked them, 'What are you fellows doing there?' and they replied with bullets"—*held*, competent as dying declarations.

**Homicide—Statement by Deceased to His Brother Shortly After Shooting Held Admissible as Dying Declaration.**

4. In a prosecution for murder of a special police officer by defendant who was trying to rob a box-car, a declaration made by deceased to his brother within less than an hour, to the effect that "the big scoundrels got me the first shot," *held* admissible as a dying declaration.

---

3. Necessity of expectation of "immediate" death to render dying declaration admissible, see note in 17 Ann. Cas. 287.

Criminal Law—Venue Put in Issue by Plea of not Guilty and must
    be Proved Beyond Reasonable Doubt.

5. The place where a murder is committed is a material and
jurisdictional allegation in the indictment which the plea of not
guilty puts in issue and requires that the prosecution prove beyond
a reasonable doubt.

Criminal Law—Court Judicially Knows Boundaries of County.

6. The court judicially knows the boundaries of a county estab-
lished by public law.

Criminal Law—Courts will Take Judicial Notice of Geographical
    Features, and Boundary Lines of Counties, Cities and Towns
    to Determine Venue.

7. For the purpose of determining venue, courts will take judicial
notice of well-known geographical features, division of states into
counties, cities and towns, and the boundary lines of such counties,
cities and towns within the state when fixed by public law, in
view of Section 729, Or. L., providing that judicial notice may be
taken of whatever is established by law.

Criminal Law—Evidence as to Gun from Which Bullets in Deceased's
    Body Fired Held Competent.

8. In a prosecution for murder by shooting, evidence by an ex-
pert that the bullets found in deceased's body had been fired from
a Colt's army special revolver such as defendant possessed, held,
competent.

Criminal Law—Acquittal of Codefendant After Defendant's Trial
    Held not to Necessitate New Trial.

9. In a prosecution for murder against defendant and another
charged in the same indictment, the fact that defendant's codefend-
ant had been acquitted in a trial subsequent to that of defendant
did not necessitate a new trial for defendant.

Criminal Law—Photograph Properly Verified Admissible in Evidence.

10. A photograph, when verified by proof that it is a true rep-
resentative of the subject, is admissible in evidence.

Criminal Law—Verification of Photograph is a Preliminary Question
    for Trial Court.

11. The sufficiency of a verification of a photograph in order to
make it admissible in evidence is a preliminary question for the
trial court.

Criminal Law—X-ray Photographs Taken of Defendant While Un-
    der Arrest Held Admissible—Official Duty Presumed Regularly
    Performed.

12. In a prosecution for murder, X-ray plates showing the wound
on defendant's arm, taken while he was under arrest, were not
incompetent as having been taken without defendant's consent; the
presumption of law, under Section 799, subdivision 15, Or. L., being
that official duty has been regularly performed.

Criminal Law—Instructions Held not Erroneous as not Applicable to Indictment.

13. In a prosecution for murder by shooting, instructions as to alibi, *held,* not erroneous as not applicable to the form of the indictment.

Indictment and Information — Indictment in Statutory Form for Murder Held Sufficient.

14. An indictment for murder in the form given in the appendix to the Criminal Code, *held,* sufficient under Constitution, Article XI, Section 11, requiring that in all criminal prosecutions accused shall have the right to demand the nature and cause of the accusation against him.   ʼ

Homicide—Indictment Held to Permit Introduction of Evidence of Felonious Breaking and Entering of Car During Which Murder was Committed.

15. In a prosecution for murder of a special police officer by defendant, caught in the act of robbing a box-car, by shooting, an indictment that defendant and another did "with deliberate and premeditated malice kill one P., by shooting him, with a pistol," *held,* sufficient to permit the introduction of evidence of felonious breaking and entering of the car by defendant.

Criminal Law—Proof of Other Distinct Crimes Than Averred cannot be Given in Evidence.

16. Proof of other and distinct crimes than the one averred in the indictment cannot be given in evidence.

Homicide—Evidence of Motive for Commission of Crime During Which Murder Occurred Held Competent, but not Essential to Conviction.

17. Where a murder is committed by defendant when caught in the commission of another crime, existence of the motive for the commission of such crime is not essential to a conviction for murder, but evidence of motive is always competent.

Homicide—Evidence That Defendant Suggested Robbing Box-car Held Admissible in Murder Prosecution.

18. In a prosecution for the murder of a special police officer by defendant while engaged in robbing a box-car, testimony that defendant suggested robbing box-cars, *held,* admissible.

Witnesses—Admission of Testimony That Defendant had Suggested Robbing Box-cars upon Redirect Examination Held not an Abuse of Discretion.

19. In a prosecution for murder of a special police officer by defendant when caught in the act of robbing a box-car, that the court admitted evidence of a statement of an acquaintance of defendant that he had suggested robbing box-cars · upon redirect examination, *held,* not an abuse of discretion.

Witnesses—Admission of Leading Questions Largely Within Discretion of Court.

20. While generally leading questions may not be asked a witness in a criminal or civil case, the matter is largely within the discretion of the court.

## ON MOTION TO RECALL MANDATE.

**Criminal Law—"Mandate" Defined.**

21. A "mandate" is the official mode of communicating the judgment of the Supreme Court to the Circuit Court.

**Criminal Law—Supreme Court may Recall Mandate to Correct Errors Therein or to Make Clear the Meaning Thereof.**

22. Though it is the general rule that the appellate jurisdiction of the Supreme Court over a case ceases when it has been determined and remanded to the lower court and the mandate has been entered of record in that court, the mandate may be recalled by the Supreme Court to correct errors therein, or for the purpose of making clear the meaning and effect of the judgment of the Supreme Court.

**Criminal Law—Supreme Court not Authorized to Reverse or Modify Judgment on Accused's Affidavit.**

23. The Supreme Court is a court of appellate jurisdiction, and in criminal cases is strictly a court of review, and has no authority to reverse or modify a judgment of a lower court on accused's affidavit.

**Criminal Law—Accused's Unsupported Affidavit That His Attorney was Intoxicated at Trial not Considered by Supreme Court on Motion to Recall Mandate.**

24. On motion to recall a mandate affirming a conviction of murder in the first degree, where the record showed that accused's attorney conducted the defense with skill, an affidavit by accused, which was wholly unsupported, that his attorney was intoxicated at the trial could not be considered.

**Criminal Law—Illegal Detention of Accused Without Preliminary Hearing cannot be Considered on Motion to Recall Mandate After Conviction.**

25. On motion to recall a mandate after its transmission to the Circuit Court, affirming a conviction of murder in the first degree, the matter of accused's detention without due process before he was given a hearing could not be considered; his remedy being *habeas corpus* at the time of such detention.

**Criminal Law—Acquittal of Codefendant After Defendant's Trial Held not to Mitigate Defendant's Penalty.**

26. In a prosecution for murder against defendant and another, charged in the same indictment, the fact that defendant's codefendant had been acquitted in a trial subsequent to a trial resulting in defendant's conviction did not in any way affect or mitigate the penalty, so as to reduce it from death to life imprisonment.

**Criminal Law—Supreme Court cannot Reduce Sentence.**

27. The Supreme Court cannot on appeal reduce death sentence to life imprisonment.

From Multnomah: J. P. KAVANAUGH, Judge.

In Banc.

Dan Casey was adjudged guilty of murder in the first degree, and sentenced to death as the penalty for his crime.

The grand jury of the Circuit Court of the State of Oregon in and for Multnomah County, by indictment, accused Casey, jointly with one John L. Burns, of the crime of murder. The charging part of the indictment alleges:

"Said Dan Casey and John L. Burns, on the 14th day of June, A. D. 1921, in the county of Multnomah and State of Oregon, then and there being, did then and there unlawfully, feloniously, purposely, and with deliberate and premeditated malice, kill one James Harry Phillips, by shooting him, the said James Harry Phillips, with a pistol, contrary to the statutes in such cases made and provided, and against the peace and dignity of the state of Oregon."

Casey demanded a separate trial, which was granted him, with the result above stated.

The defendant says the court erred:

In admitting into the record, over defendant's objection, the testimony of the witnesses, John P. Phillips and Herman G. Snider, consisting of declarations made by the deceased relating to the homicide;

In admitting, over defendant's objection, the testimony of Murphy to the effect that there were no other persons around the train when it reached Troutdale, Oregon, than those named;

In overruling objections to the introduction of certain exhibits as evidence;

In admitting certain evidence, over defendant's objection, and in rejecting certain proffered testimony;

In refusing to grant defendant's motion for a directed verdict on the ground of the insufficiency of

the testimony, particularly as it related to the venue of the offense; and,

In charging the jury.          AFFIRMED.

For appellant there was a brief over the names of *Mr. Charles W. Garland* and *Mr. John C. Lane,* with an oral argument by *Mr. Garland.*

For respondent there was a brief over the names of *Mr. Stanley Myers,* District Attorney, *Mr. George Mowry,* Deputy District Attorney, *Mr. Joseph L. Hammersley,* Deputy District Attorney, and *Mr. Maurice Crumpacker,* Deputy District Attorney, with an oral argument by *Mr. Mowry.*

BROWN, J.—A clear understanding of the facts in this case is the best exposition of some of the legal questions presented by defendant.

This is a case of homicide, committed in Multnomah County, Oregon. At about the hour of 10 o'clock P. M. on June 14, 1921, James Harry Phillips, aged 52 years, a special agent of the O.-W. R. & N. Company, while in the performance of his duty, was mortally wounded. He was taken to St. Vincent's Hospital, where his life expired in a little more than an hour after having been stricken down by a gunshot.

On June 15th, Dr. Frank R. Menne, coroner's physician, performed an autopsy on the body of the deceased, and found three bullet wounds: one about three inches to the left of the midline and about the region of the abdomen; one on the right arm, and another in the right hip. The bullet that entered to the left of the midline in the abdomen pierced the eighth rib. It ranged upward and entered the abdominal cavity, penetrated the large bowel, the first

portion of the small bowel, the kidney, and then through the muscles of the back about an inch and a half from the midline in the back. The second wound the doctor described as penetrating the body of the deceased "three inches or so above the elbow, upward along the bone to the junction of the collar bone with the shoulder blade. This it shattered, destroyed. It then passed inward to the right of the neck, where the bullet was found. The wound in the right hip was simply beneath the skin, producing a furrow about six inches long beneath the skin." Death was caused from bleeding as a result of the fatal gunshot wound of the kidney.

Dan Casey and John L. Burns were accused of killing Phillips, and were apprehended on June 17, 1921, the third day following the homicide.

The record informs us that Casey and Burns first met near Glenn Falls, Idaho, in the autumn of 1920. Some time during February, 1921, Elizabeth Burns, the wife of John L. Burns, came to Portland and lived for a while at the home of Mr. and Mrs. A. C. Van Diver. Van Diver, Burns and Casey had all been switchmen. The Van Divers were former acquaintances of the Burns family, having met them in Gerber, California. Casey called on Mrs. Burns about three days after she came to Portland, and was made acquainted with Mr. and Mrs. Van Diver. He visited the Van Diver home on many occasions thereafter. The Van Divers were important witnesses in the trial of this case. Casey lived for a time at the Baxter Hotel. Mrs. Burns left the Van Diver home after living there about three weeks, and went to reside at the Baxter Hotel. While Mrs. Burns was living at the Van Diver home, she displayed two 38 Colt's revolvers, the numbers having

been removed from both by filing. Later, the de-
fendant Casey asked Mrs. Burns where his gun was.
She answered: "I have them in my grip." She got
the revolvers out and gave him his. That gun is
marked Exhibit 32 in this case. Casey "fixed it up,"
loaded it and retained possession of it. When Mrs.
Burns removed to the Baxter Hotel she took the
other Colt's revolver with her. A few days after
her removal to the hotel, she was joined by her hus-
band, John L. Burns, who came to Portland from
Idaho upon his release from jail in the latter state.
Some time in April, 1921, Burns and his wife assumed
charge of a rooming-house situate at 129½ Russell
Street, a short distance from Van Diver's, and a few
blocks from the Albina railroad yards. After their
removal to that place, Casey joined them and took up
his abode at the rooming-house, but continued to call
frequently at Van Diver's. The Burns family occu-
pied Rooms 14, 15 and 16 of the rooming-house, and
Casey occupied Room 11, which is located across the
hall from Room 16 thereof. Van Diver said, in telling
of Casey's visits to his house:

"He was down to my house quite frequently after
they moved, and every day at my house when they
first came to my house. He was there every day,
ate meals at my house. * * He came down to my
house several times and planned on going out and
sticking up fellows, and I told him I couldn't see it
that way."

Witness further testified that Casey suggested rob-
bing box-cars.

Then follows the fatal night of June 14th, when
special agent Phillips of the O.-W. R. & N. Company,
while engaged in preventing the freight-cars from be-
ing looted, was shot down by persons who were bur-
glarizing Car No. 13 of Extra East-bound Freight

Train No. 708, at a point about two and one-half miles from Albina yards. Two men, one of them being very tall, were at the scene of the crime and fled immediately following its commission. Casey is very tall. The special agent was killed by a wound inflicted with a 38-caliber leaden ball. The revolvers of Casey and Burns were 38-caliber guns. The special officer was armed with a 38 Smith and Wesson revolver. He fired four shots at his assailants. The prints of blood found in various places in the direction in which the two men fled from the scene of the crime indicated that one of Phillips' assailants had been wounded. The wound that Phillips inflicted upon his assailant was made with a leaden ball fired from a 38-caliber revolver. On the seventeenth day of June, the third day after the shooting of Phillips, the defendant was arrested while in concealment under Burns' bed. He had a gunshot wound in his wrist, that had been made by a 38-caliber leaden ball. This wound was about three days old, and no older.

Casey claims an alibi. He says he was in and about the rooming-house at the hour of the commission of the crime at Mock's Bottom. He accounts for his wounded arm with conflicting stories. He told a physician and surgeon who examined it on the day of his arrest that it had been snagged in an automobile accident. He told another physician who examined it on the 20th that he was shot on June 10th while engaged in a fight with a man at a moonshiner's still out from Vancouver, Washington. Notwithstanding the character of the wound, he dressed it himself. He explained that he was in hiding when found because he feared that he would be arrested for moonshining. It was shown by the state that Casey had no wound on his wrist during the time between

the 10th and the evening of the 14th of June. According to his testimony, at least four persons were present when Casey says he was shot, but he produced nobody to verify his statement. The story that Casey was shot on June 10th, and by someone while engaged in a fight near Vancouver, Washington, or that he had that wound at all before the night of June 14th, was utterly pulverized by the prosecution. Casey likewise denied ownership or knowledge of his Colt's revolver, which was found, with spots of human blood upon it, concealed in an adjoining room from his.

Who wounded Casey in the arm, and where was he when he was shot, and why did he conceal the true fact? Let us further refer briefly to the record.

James Harry Phillips, the deceased, and Herman G. Snider, were both employed as special agents of the O.-W. R. & N. Company, and worked together. On the evening of June 14, 1921, immediately prior to the departure of Extra East-bound Freight Train No. 708, from the Albina yards, and pursuant to their duty, they examined the doors and seals of the cars making up that freight train. They found all doors of the cars closed, and seals intact. The train was in charge of conductor Albert C. Murphy, and was scheduled to leave at 9:30 that evening. However, from the train-dispatcher we learn that the train left Albina yards at 9:50 P. M.; that it was scheduled to go through St. Johns junction, through the tunnel, and around by Troutdale to The Dalles; that soon after leaving Albina, the train stopped at Mock's Bottom, Multnomah County, Oregon, where there is a double track; that from the office at Albina to St. Johns junction and Mock's Bottom the distance is 2.5 miles; that all trains had orders to run slowly on ac-

count of high water; that the freight train was delayed at Mock's Bottom in order to permit passenger train No. 561 from Seattle to pass over the single tract through a tunnel.

Now, recurring to the movements of the special agents: The record discloses that when they had completed their inspection of the cars, and as the freight train pulled out of Albina yards, they got on the rear end of the caboose. When the freight reached Mock's Bottom, where it was to remain until the passenger came through the tunnel, the conductor observed to the officers that—

"I believe this is where these fellows get on these trains."

Thereupon, the special agents again proceeded to inspect the cars, and started from the caboose along the sides of the train toward the locomotive. Phillips advanced upon the right hand, or the engineer's side, and Snider approached the engine on the left hand, or the fireman's side, of the train. Phillips started first, Snider stopping to converse with the conductor a moment before starting. This delay placed Phillips about two car-lengths ahead of Snider. When Phillips passed the eighth car from the caboose, he saw Harry Patterson, a laborer, who was riding on the flat car on his way to the hay-fields at Baker. Phillips spoke to him and passed on. Soon thereafter Snider came. He also spoke to Patterson and proceeded onward. After Snider had advanced about two car-lengths from Patterson, or, at about the time that he reached the tenth car from the caboose, he heard six or seven shots, or more, in "quick succession." Snider knelt low, next to the box-car, in order that he might see anybody coming from under the cars. Immediately following the shooting he saw

two men emerge from underneath the train, about three car-lengths from the place where he was kneeling. That would be the thirteenth car from the caboose. He testified that when he saw the men he got up and shot twice as they were running north. He says that just as they got close to a string of box-cars that were standing on another railroad track he could identify them "on account of the glare coming through, I would judge, from the locomotive headlight, from the tunnel, or in the tunnel." He was about to fire his third shot when he saw two flashlights coming from the opposite side of the freight train. This signal, by a code established between Phillips and himself, meant "Danger! Quick!" Immediately responding to the signal, he crossed the railroad track beneath the train and found Phillips lying on his back about the center of car 12 from the caboose, with his head towards the caboose. His left hand was lying over the right rail and on his flashlight, and in his right hand his revolver was clasped. Phillips said to witness:

"Herman, they hit me hard. They got me in the guts. My time is short. Get me to brother Jackie, quick."

At that time Phillips was moaning and "the sweat was just rolling off of him." Phillips also said to him at that time and place:

"They were two tall men. They were breaking into a box-car. I asked them, 'What are you fellows doing there?' and they replied with bullets."

The door on car 13, which was loaded with mixed merchandise, had been opened fourteen or sixteen inches. Snider, on being asked to describe the two men who crawled from underneath the train and fled, testified:

"One was an extraordinary tall man and the other man was probably about five inches smaller, that is in stature, the way I could see it from that distance. The glare of light I got I could see that one man was an extraordinary tall man with long legs and long arms, and his broad shoulders, I could pick him out in the thousands. One in a thousand, I could pick that man out. * *

"Q. In what respects did either of the men, as to their height, and their shoulders, legs, arms, or any other features you observed that night, coincide and compare with the defendant Casey?

"A. I would say it is the man."

Harry Patterson, laborer, 68 years old and for many years a resident of this state, wishing to go to the hay-fields at Baker, went to the Albina yards in Portland, on the evening of June 14, 1921. The roadmaster informed him that there would be a train out at 9 or 9:30 o'clock. With his bundle he got on a flat car,—the eighth car from the caboose,—on which were two "case separators." He rode on the engineer's side of the train, his legs hanging over the car. He saw Casey and Burns twice that night, preceding the homicide. He first saw them about three quarters of a mile beyond the Albina yards, standing beside the track. It will be remembered that the train was running very slowly on account of high water. He next saw them after the train had stopped at Mock's Bottom. Patterson testified that they walked right up to him; that he could have put his hand on the shoulders of either of them. He was positive, in his testimony, and especially so on cross-examination, of his ability to identify them, on account of their giving him such a searching "once over" as they passed him. These men were going toward the engine, one ahead of the other, on the

engineer's side of the train. He said that about two minutes later he saw an officer, whom he afterwards learned to be Phillips, going in the same direction. Phillips spoke to him. Soon came the second officer whom he later learned to be Snider, also traveling in the same direction, but on the fireman's side of the train. Witness could not testify as to the time, but said about two or three minutes after the officers passed he heard seven or eight shots. Immediately following the shooting, Snider returned and said: "My partner is shot." Patterson at once got off the car and went back and "helped pull Mr. Phillips under the * * train and helped * * put him on the car." Blood was found 33 feet from where the body of Phillips lay. This blood followed the trail of the fleeing men. One of the witnesses said:

"The blood spots showed that there must have been a little more speed than an ordinary walk, or a considerable swing of some kind, possibly an arm or a leg, for the reason that the blood spots showed that they spattered out and left sort of a little delta at the end of them."

Three 38-caliber revolver shells that had been fired were picked up along the track the following morning.

John P. Phillips testified that he saw his brother as he went to work at about 8 o'clock P. M. June 14, 1921; that he next saw him at about 10:30 the same night at the Union station, lying on a stretcher in an express-car, wounded and in a serious condition.

"He was moaning, complaining of his pain, * * but conscious."

Witness addressed his brother:

"Boy, you are hard hit, are you not?"

The wounded man answered:

"Yes, Jackie, the big scoundrels got me the first shot."

A few minutes later the wounded man was taken to the hospital, arriving there at about 10:30 or 10:40 P. M. When he was undressed, a ball shot from a 38-caliber gun was found between his underclothing and his body. Life expired at 11 or 11:15 P. M.

Witness identified the revolver of deceased, which was received in evidence and marked State's Exhibit "6." The gun contained four empty shells. The revolver was a 38 special Smith and Wesson, officers' model.

The defendant says the court erred in the admission in evidence, over his objection, of the declarations of the deceased relating to the homicide hereinbefore set down, for the reason that such statements were immaterial, irrelevant and incompetent, hearsay and not made under a sense of impending death.

1, 2. The competency of a dying declaration is for the court; its weight, for the jury. The law in this state as to the competency of dying declarations is well settled. It was competent to prove, in the trial of this cause, the declaration or act of the deceased "made or done under a sense of impending death, respecting the cause of his death." Section 727, subd. 4, Or. L.; *Goodall* v. *State,* 1 Or. 333 (80 Am. Dec. 396); *State* v. *Fitzhugh,* 2 Or. 227; *State* v. *Garrand,* 5 Or. 216; *State* v. *Ah Lee,* 7 Or. 237; *State* v. *Ah Lee,* 8 Or. 218; *State* v. *Saunders,* 14 Or. 300 (12 Pac. 441); *State* v. *Pool,* 20 Or. 150 (25 Pac. 375); *State* v. *Shaffer,* 23 Or. 557 (32 Pac. 545); *State* v. *Foot You,* 24 Or. 61, 75 (32 Pac. 1031, 33 Pac. 537); *State* v. *Fletcher,* 24 Or. 295 (33 Pac. 575); *State* v. *Gray,* 43 Or. 446 (74 Pac. 927); *State* v. *Thompson,* 49 Or.

46 (88 Pac. 583, 124 Am. St. Rep. 1015); *State* v.
*Doris,* 51 Or. 137 (94 Pac. 44, 16 L. R. A. (N. S.)
660); *State* v. *Fuller,* 52 Or. 42 (96 Pac. 456); *State* v.
*Ju Nun,* 53 Or. 1 (97 Pac. 96, 98 Pac. 513); *State* v.
*Yee Gueng,* 57 Or. 509 (112 Pac. 424).

The doctrine announced by the authorities above
cited is that the admission of dying declarations into
the record as evidence constitutes an exception to the
general rule excluding hearsay evidence. Such testi-
mony should be received only with great caution and
care, after a satisfactory showing that such statement
is, in fact, a "dying declaration," as that term is
defined by law. Such a declaration is not made in
the presence of the defendant. The declarant is
neither subject to cross-examination, nor does he meet
the accused "face to face." The constitutional guar-
anty, however, is met when the witness who testifies
to the declaration confronts the accused. Notwith-
standing the objections that are urged against this
character of hearsay evidence, the due administration
of justice requires that dying declarations be re-
ceived as evidence in homicide cases.

In the case at bar, the declarations objected to were
clearly admissible as evidence, for they meet all the
requirements of the law of evidence involving dying
declarations. At the time Phillips talked to Snider
immediately following the firing of the shots into his
body by his assailants, all hope of life had been aban-
doned. Phillips knew that he was mortally wounded.
He was conscious that his dissolution was impending,
certain, and that very soon he would be touched by
the hand of death. True, he did not say, "I am
dying from my wounds," nor did he say, "This is
my dying declaration." The law does not recognize
any particular form of words as proof of a dying

108 Or.—26

statement. The very nature of the situation then existing with reference. to the wounded man's condition proves the competency of the statements. A vigorous man, in possession of all his faculties, was engaged in the discharge of his labors. The crack and flash of gunshots were heard and seen. The strong man was stricken down. He was found helpless alongside the railroad track, with one hand over the rail, bleeding internally from his wounds, and suffering indescribable torment. With these circumstances confronting James Harry Phillips, but one inference can be drawn as to what he believed about the near approach of death and as to what he meant when he moaned:

"Herman, they hit me hard. They got me in the guts. *My time is short.* Get me to brother Jackie, quick."

3, 4. Within an hour thereafter, he was dead. The evidence was competent, as was the declaration made to his brother, hereinbefore set out, for the reason above noted. The wounded man never regained hope of recovery after his statement to Snider. These declarations were made freely and voluntarily, upon the dying man's own volition, and relate to the *res gestae.*

Defendant asserts in his brief that the state failed to prove the venue of the crime.

"Except as in this chapter otherwise specially provided, all criminal actions must be commenced and tried in the county where the crime was committed." Section 1390, Or. L.

It is further provided that—

"In all criminal prosecutions, the accused shall have the right to public trial * * in the. county in

which the offense shall have been committed.'' Section 11, Article I, Const.

5. The place where the crime was committed is a material and jurisdictional allegation contained in the indictment, which the plea of not guilty made by the defendant puts at issue and requires that the prosecution prove, beyond a reasonable doubt.

6. In the case at bar, there was evidence sufficient to satisfy the trial jury beyond a reasonable doubt that the homicide alleged in the indictment to have been committed was committed at a place known as Mock's Bottom, situate in Multnomah County, Oregon. This appears from the testimony of the witnesses who were at the side of Phillips immediately following his wounding. It also appears inferentially from the testimony of the railroad officials and from the speed at which the train was traveling from the yards at Albina to St. Johns junction. The court judicially knows the boundaries of Multnomah County. It has been established by a public law, and that the wound was inflicted upon the body of deceased in that county was established in the trial of this cause beyond peradventure.

7. For the purpose of determining venue, courts will take judicial notice of well-known geographical features, the division of states into counties, cities and towns, and the boundary lines of such counties, cities and towns within the state, when fixed by public law: 13 Ency. of Ev. 930; Section 729, Or. L.

8. Appellant says:

''The court erred in admitting in evidence over defendant's objection the testimony of the witness Robert H. Craddock, * * and in receiving in evidence State's Exhibits Nos. 45 and 44.''

A revolver bullet that had been fired through a 38-caliber weapon was found between the clothing of deceased and his body. A like bullet was found in his body.

State's Exhibit No. 32 is a Colt's army special revolver, that was traced by the evidence into Casey's possession and was found concealed in a room adjoining his bedroom at the time of his arrest. At this time there was found in Burns' bed, under which Casey was hiding, a weapon of the same kind, that was offered and received in evidence as State's Exhibit No. 22.

Robert H. Craddock, a well-known pistol expert, qualified as such, and testified at the trial. The exhibits objected to consist of two bullets, each driven through the pistol found in Burns' bed under which the defendant was hiding when arrested, and two balls driven through the defendant's gun. By comparing the rifling marks on the test bullets with the rifling marks appearing on the two leaden balls that were found in and on the body of Phillips, the deceased, the expert was qualified to testify that, in his opinion, the bullets removed from the body of the dead man had each been fired from a Colt's army special revolver. The testimony was competent. Its weight was exclusively for the jury. Recent cases involving experiments presented to the jury are: *Kohlhagen* v. *Cardwell,* 93 Or. 610, 619 (184 Pac. 261, 8 A. L. R. 11); *State* v. *Holbrook,* 98 Or. 43, 61 (188 Pac. 947, 192 Pac. 640, 193 Pac. 434); *State* v. *Clark,* 99 Or. 629, 665 (196 Pac. 360).

9. Dan Casey and John L. Burns were accused by the grand jury, in the same indictment, of the crime of murder by slaying James Harry Phillips. It is now asserted that because Burns has been acquitted

in a trial subsequent to that of Casey, a new trial should be granted to Casey.

The fact that Burns and Casey were both accused by the same indictment, and that one of them has since been acquitted of the charge of murder contained in the indictment is not competent or relevant as evidence in the trial of the other. Had Burns been acquitted prior to the trial of Casey, it would not have been evidence . of Casey's innocence, nor would his conviction, if found guilty prior to the trial of Casey, have been evidence of Casey's guilt. Casey must answer, in person, his own obligations to the law he has offended.

In the case of *State* v. *Branton,* 33 Or. 533 (56 Pac. 267), it was said:

"Where more than one join in the commission of an offense which is not necessarily several, all or any number of them may be jointly or separately indicted therefor: Wharton's Cr. Pl. (8 ed.), § 301; Bishop's New Cr. Proc., § 483; *State* v. *O'Brien,* 18 R. I. 105 (25 Atl. 910). 'We take the general rule to be,' say the court in *Commonwealth* v. *Griffin,* 3 Cush. 523, 'that in every indictment against two or more the charge is several as well as joint,—in effect, that each is guilty of the offense charged; so that, if one is found guilty, judgment may be passed on him, although one or more may be acquitted.' To the same effect see, also, *Commonwealth* v. *Brown,* 12 Gray, 135. So, too, a joint indictment against all who participate in the commission of a crime is, in effect, a several indictment against each: *State* v. *O'Brien,* 18 R. I. 105 (25 Atl. 105)."

Enlarged photographs of bullets and cartridges, as well as photographs of defendant's wounds, were offered by the state and received in evidence.

10. It is now overwhelmingly established in this and other jurisdictions that a photograph, when veri-

fied by proof that it is a true representation of the subject, is admitted in evidence for the same reason that maps, models or diagrams in illustration or explanation of the testimony are adduced in evidence: 3 Jones' Commentaries on Evidence, p. 756, and numerous authorities under note 5. An interesting case is that of *State* v. *Clark,* 99 Or. 629, 663 (196 Pac. 360). The sufficiency of the verification is a preliminary question for the trial court.

11. In the case at bar, all photographs were proved to be true and correct representations of whatever they purported to reproduce, and were therefore admissible and competent as evidence, and helpful to the jury in elucidating the oral evidence received upon the trial.

In *People* v. *Fish,* 125 N. Y. 136 (26 N. E. 391), it was said by Mr. Justice EARL, in delivering the opinion of the court:

"It was proved that the photographs were accurately taken and were true representations of the barber-shop and the location of the wound; and such evidence is now everywhere held to be competent."

12. Exhibits 24, 25 and 26, X-ray plates, were received in evidence over objection that they were incompetent, irrelevant and immaterial. It is now urged in defendant's brief that these pictures showing the wound on defendant's arm were taken while he was under arrest, and that for that reason it was error to admit them as evidence into the record of this case.

The plates were competent and relevant. The pictures disclosed by the plates were a marked aid to a correct understanding of the oral testimony. There is nothing in the record showing that the X-ray pictures were taken against the will or without the full

consent of the defendant. There is no suggestion in the record that the officers or anyone else compelled the defendant to have his wounds photographed, or that they tricked him into having the photographs made, or that the officers or anyone else did anything toward requiring defendant to supply evidence against himself. It is a presumption of law, disputable, however, "that official duty has been regularly performed." Section 799, subd. 15, Or. L.

It cannot be presumed, in the absence of evidence to the contrary, that the officers of the law violated the rights of the defendant, or that they were guilty of wrongdoing in procuring the X-ray photograph of his wounded arm: *State* v. *McNeal* (Mo. App.), 237 S. W. 738; *Lenox* v. *Harrison,* 88 Mo. 491; *Mathias* v. *O'Neill,* 94 Mo. 528 (6 S. W. 253); *Yarnell* v. *Railway Co.,* 113 Mo. 579 (21 S. W. 1, 18 L. R. A. 599); *Hartwell* v. *Parks,* 240 Mo. 544 (144 S. W. 793); *State* v. *Hart* (Mo. App.), 237 S. W. 473.

The defendant criticises the court's instructions, as not applicable to the form of the indictment. In his brief, he says:

"It will be noted that the indictment upon which the defendant was tried includes only the first subdivision of Section 1893, Or. L. The state, by using the word 'and,' could have shown and also given the defendant notice that he was to be tried for the crime while attempting to commit, or committing, the felonies mentioned. The Constitution requires that a defendant be given notice in the indictment of what he is charged: Sec. 2, Art. I. * * * Evidence of other crimes is inadmissible under an indictment based solely upon premeditation. * * The instruction of the court was not cured by other instructions, and must have had a decided bearing upon the fate of the defendant, as the court had permitted the state to show every particle of testimony relating to the commission

of robbing box-cars throughout the trial. * * The part [of the instruction] reads as follows:

" 'The crime charged implies that the defendant * * , with the codefendant, were attempting to burglarize a box-car, and, when interrupted, they shot and killed the decedent.' "

The charge objected to was a part of an instruction given by the court relating to an alibi. We will quote the remainder of that instruction:

"The defense contends that the defendant was at a place remote from the scene of the homicide when Mr. Phillips was shot. That is commonly known as an alibi. 'Alibi' is a Latin word and means 'elsewhere.' The defendant would have to be at the scene of the murder in order to be guilty of the crime charged in the indictment or any of the lesser crimes included therein. So, if you find the defendant was at the corner of Mississippi Avenue and Russell Street at the time the shooting occurred, you should find him not guilty. The defendant is not required to prove his alibi beyond a reasonable doubt, or by a preponderance of the evidence, because the burden of proof does not rest upon him; but it is sufficient, if you have a reasonable doubt in your minds as to whether he was at the scene of the homicide when Phillips was shot. And by that I mean that you should be satisfied beyond a reasonable doubt that the defendant was at the scene of the crime when the deceased was shot, before you can return any verdict of guilty against him."

The foregoing instruction is not out of harmony with the requested instructions of the defendant, which read as follows:

"Requested Instruction No. 3.

"In this case, the state of Oregon has attempted to prove that the defendant Casey killed the deceased, Phillips, while in the commission of a felony: to wit, the robbery of a freight-car; and before you can find

deliberate and premeditated malice, you must be satis-
fied, beyond a reasonable doubt, that the defendant
was committing, or attempting to commit, a robbery,
and that in the pursuance of such act he killed the
deceased Phillips; and such act must be proved to
your satisfaction, beyond a reasonable doubt. * *

"Requested Instruction No. 5.

"Every material element of the offense charged in
the indictment must be established by the proof, be-
yond a reasonable doubt. * * That the defendant
Casey was at the scene of the crime at the time the
same was committed; and that he was attempting to
rob a box-car, and that when interrupted he shot and
killed the deceased Phillips; * *

"Requested Instruction No. 9.

"The defense in this case have interposed an
alibi * * ."

The defendant cannot now come into this court
and abandon its theory: 38 Cyc. 1788, 1789; 14
R. C. L., p. 618, § 73.

The court carefully defined the terms "delibera-
tion," "premeditation" and "malice," and charged
the jury with the necessity of proof thereof.

13. After a careful examination of the instructions
given by the court to the jury, we find them as
favorable to the defendant as he has a right to de-
mand.

The defendant complains that the indictment failed
to inform him of the nature of the charge against
him, in that it did not set forth the burglary in
which he was engaged when he slew Phillips.

A homicide committed in the perpetration of a bur-
glary is not a distinct offense. As held by the Su-
preme Court of Missouri, it is but one of the methods
of committing murder in the first degree: *State* v.
*Bobbitt,* 215 Mo. 10 (114 S. W. 511); 1 Michie on
Homicide, p. 114.

The indictment accusing the defendant of crime in the case at issue contains the title of the action, specifies the name of the court to which it is presented, and the names of the parties, together with a statement of the acts constituting the offense, as required by Section 1437, Or. L. Section 1439, Or. L., enacts that the manner of stating the acts constituting the crime, as set forth in the appendix to the Code, is sufficient in all cases where applicable, and that in other cases forms may be used as nearly similar as the nature of the case will permit. The indictment in the instant case follows Form No. 1 in the appendix to the Code.

14. It has been held by this court many times that an indictment which contains every allegation described in the form given in the appendix to the Criminal Code is sufficient for such crime. The indictment in the case at bar fulfills the command of Section 11, Article I of the Constitution, that "in all criminal prosecutions the accused shall have the right * * to demand the nature and cause of the accusation against him * *." It informs him that he is accused of murder committed on the fourteenth day of June, 1921, in Multnomah County, Oregon, by purposely and of his deliberate and premeditated malice killing one James Harry Phillips by shooting him with a gun.

At common law, it was sufficient to charge murder in the common form, and then upon trial, if the proof showed that the crime was committed in the perpetration of robbery, arson, or other felony, this answered the ends of the prosecution and stood instead of proof of malice aforethought.

Under statutes such as ours, most jurisdictions follow the common-law rule.

In *State* v. *Anderson,* 53 Or. 479 (101 Pac. 198), the learned judge, in speaking for this court, could have added that the great weight of authority is in harmony with the common-law doctrine.

"Under statutes providing that murder in the perpetration or attempt to perpetrate certain specific felonies shall constitute murder in the first degree, it is not necessary that an indictment drawn in the ordinary form for the first degree contain a specific averment that the offense was committed in connection with one of such felonies, to permit proof and conviction thereof." 21 Cyc. 840.

Supporting this text are *State* v. *Johnson,* 72 Iowa, 393 (34 N. W. 177); *State* v. *Foster,* 136 Mo. 653 (38 S. W. 721); *Titus* v. *State,* 49 N. J. L. 36 (7 Atl. 621); *People* v. *Giblin,* 115 N. Y. 196 (21 N. E. 1062, 4 L. R. A. 757); *Commonwealth* v. *Flanagan,* 7 Watts & S. 415.

"Nor is it necessary to set out the facts descriptive of the connected felony." 21 Cyc. 840, subd. e; citing *People* v. *Willett,* 102 N. Y. 251 (6 N. E. 301); *State* v. *Covington,* 117 N. C. 834 (23 S. E. 337); *Nite* v. *State,* 41 Tex. Crim. 340 (54 S. W. 763).

In the leading case of *People* v. *Giblin, supra,* the court said:

"If the indictment contain a plain and concise state ment of the act constituting the crime, and the proof as to the manner in which it was perpetrated brings it within one of the statutory definitions of murder in the first degree, the requirements of the law are sufficiently met."

In *State* v. *Johnson, supra,* the indictment charged first degree murder and alleged premeditation, deliberation and malice. It did not allege that the crime was committed in the perpetration of a robbery. The court held that the indictment alleged facts sufficient

to charge murder in the first degree, and that proof
of the killing in an attempt to rob was sufficient to
sustain a conviction of first degree murder, and that
it was not necessary to allege the facts and circum-
stances attending the crime.

In *State* v. *Foster, supra,* the court held that the
indictment may be drawn in common form; and, in
support thereof, that the proof may show that the
homicide was committed in the perpetration of a rob-
bery, and when such proof is made it is equivalent
to "that premeditation, deliberation, etc., which other-
wise are necessary to be proved in order to constitute
murder in the first degree."

"A murder committed in the perpetration or at-
tempt to perpetrate a robbery fully shows express
malice. The turpitude supplies the element of pre-
meditated malice. * * A murder committed in an at-
tempt to commit robbery is murder in the first de-
gree, though there is no deliberate or premeditated
design to kill. So proof that a homicide was com-
mitted in the perpetration of a robbery is equivalent
to that deliberation otherwise necessary to constitute
murder in the first degree." 1 Michie, Homicide,
p. 119.

In a prosecution for first degree murder, proof
that the defendant did kill while engaged in the com-
mission of the crime of burglary dispenses with the
necessity for proving malice, felonious intent and de-
liberate mind: *People* v. *Smith,* 187 N. Y. Supp. 836.

Failure of the information to allege that defendant
killed deceased while attempting or perpetrating a
robbery, although proof showed such to be the fact,
does not constitute a fatal variance: *People* v. *Page,*
198 Mich. 524 (165 N. W. 755).

In a prosecution for murder under an information
charging murder in the first degree in the common

form, evidence showing that the murder was committed in perpetration of robbery, held to sustain the allegations of the information: *State* v. *Roselli,* 109 Kan. 33 (198 Pac. 195).

Where a party, having been discovered in the act of burglarizing a building, attempted to escape, and, in furtherance thereof, shot and killed another, it was held that the killing may constitute murder in the first degree, though the act did not occur at the site of the burglary: *Francis* v. *State,* 104 Neb. 5 (175 N. W. 675); *Parker* v. *State,* 104 Neb. 12 (175 N. W. 677).

15. The indictment is sufficient to permit the introduction of the evidence of the felonious breaking and entry of the car by defendant.

"At common law, it was not necessary to charge in an indictment for murder that the murder was committed in the perpetration of another crime in order to introduce proof showing that a felony was attempted in committing it; it was sufficient to charge murder in the common form, and then upon proof that it was committed in the perpetration of a felony, malice, deliberation and premeditation were implied. And statutes defining different degrees of murder and subjecting them to different punishments do not render it necessary to alter the form of an indictment for the crime or to supply such facts as would show the offense to be murder in any particular degree. And an indictment in the common law form is sufficient under statutes dividing the crime of murder into degrees and providing that all murder perpetrated in the commission of or attempt to commit a felony or certain named felonies is murder in the first degree, as a charge of murder thereunder." Wharton on Homicide (3 ed.), § 574.

But in the case at bar, it is unnecessary for us to decide that proof of burglary supplies the evidence

of deliberation and premeditation in order to constitute murder in the first degree, because of the' fact that the court fully charged the jury that proof of premeditation and deliberation was requisite to establish defendant's guilt of murder in the first degree.

The defendant was not wrongfully convicted by the admission of evidence of his commission of the crime of burglarizing a box-car upon the occasion of the homicide.

16. It is a well-established general rule in the reception of evidence that proof of other and distinct crimes than the one averred in the indictment cannot be given in evidence: *State* v. *Baker,* 23 Or. 441 (32 Pac. 161); *State* v. *O'Donnell,* 36 Or. 222 (61 Pac. 892); *State* v. *McDaniel,* 39 Or. 161 (65 Pac. 520); *State* v. *Lee,* 46 Or. 40 (79 Pac. 577).

The rule of evidence is well stated in the case of *State* v. *Adams,* 20 Kan. 311, 319, by Mr. Justice BREWER, who afterwards became a distinguished associate justice of the Supreme Court of the United States. In speaking for the Kansas court, he wrote:

"It is clear that the commission of one offense cannot be proved on the trial of a party for another, merely for the purpose of inducing the jury to believe that he is guilty of the latter because he committed the former. You cannot prejudice a defendant before a jury by proof of general bad character, or particular acts of crime other than the one for which he is being tried; and, on the other hand, it is equally clear that whatever testimony tends directly to show the defendant guilty of the crime charged is competent, although it also tends to show him guilty of another and distinct offense. * * A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him. A man may commit half a dozen distinct crimes and the same facts, or some of them, may tend directly to prove his guilt of all,

and on the trial for any one of such crimes it is no objection to the competency of such facts as testimony, that they also tend to prove his guilt of the others.''

The evidence of the burglary of the car was inseparably connected with that of the homicide in the case at bar.

In the leading case of *People* v. *Molineux*, 168 N. Y. 264 (61 N. E. 286, 62 L. R. A. 193), the exception to the general rule that a distinct crime unconnected with that laid in the indictment is incompetent when offered in evidence against a defendant, is thus stated:

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged, when it tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial."

This rule is followed in the noted case of *State* v. *Hyde*, 234 Mo. 200 (136 S. W. 316, Ann. Cas. 1912D, 191).

"Motive, in murder, is the impulse or purpose that induces the murderer to kill his victim." *State* v. *Hyde, supra.*

17. The existence of a motive for the commission of a crime by the defendant is not essential to his conviction for the crime of murder. However, evidence of motive, in cases depending largely upon circumstantial evidence, is always of value and is competent: *State* v. *O'Donnell*, 36 Or. 222 (61 Pac. 892); *State* v. *Martin*, 47 Or. 282 (83 Pac. 849, 8 Ann. Cas. 769); *State* v. *Hembree*, 54 Or. 463 (103 Pac. 1008); *State* v. *Start*, 65 Or. 178 (132 Pac. 512, 46 L. R. A. (N. S.) 266); *State* v. *Wilkins*, 72 Or. 77 (142 Pac. 589).

In the case last cited, as a motive for the killing, Frankie Winters, the daughter of L. L. Winters, the deceased, was permitted to testify to an assault committed upon her by Wilkins, the defendant, over objection, on the grounds of its irrelevancy, as well as for the further reason that it tended to establish the commission of another offense at another time and under other circumstances not connected with the charge in the indictment. She was permitted to give evidence to the effect that Wilkins and his wife were camped for a time, living in a tent on the Lower Columbia; that witness visited them, and that during the visit Wilkins made an aggravated sexual assault upon her. She further testified that the defendant vowed he would accomplish his purpose, even if he had to kill her. This court held that notwithstanding the testimony tended to prove another crime against the defendant, yet it was admissible as throwing light upon the motive controlling him in his attack upon the decedent.

Among the many authorities supporting the foregoing doctrine are the following: 2 Wharton, Crim. Ev., 884, 893; Underhill on Crim. Ev. (2 ed.), 90; 2 Bishop, Crim. Proced. 1083, 1120, 1125; *State* v. *Wintzingerode,* 9 Or. 153; *State* v. *Moran,* 131 Iowa, 645 (109 N. W. 187); *Moore* v. *United States,* 150 U. S. 57, 61 (37 L. Ed. 996, 14 Sup. Ct. Rep. 26); *State* v. *King,* 24 Utah, 482 (68 Pac. 418, 91 Am. St. Rep. 808); *People* v. *Morse,* 196 N. Y. 306 (89 N. E. 816); *Hillen* v. *People,* 59 Colo. 280 (149 Pac. 250); *State* v. *Deschamps,* 42 La. Ann. 567 (7 South. 793, 21 Am. St. Rep. 392); *State* v. *Rudolph,* 187 Mo. 67 (85 S. W. 504).

18. Statements made by the defendant to A. C. Van Diver in relation to robbing freight-cars were

clearly admissible: *State* v. *Hayward,* 62 Minn. 474 (65 N. W. 63); *State* v. *Osnes,* 14 Mont. 553 (37 Pac. 13).

19. The fact that the court admitted the testimony upon redirect examination is not, as is urged by defendant, an abuse of discretion.

Defendant says error was committed in overruling an objection to a question he calls leading.

20. It is a general rule that leading questions may not be asked a witness in a civil or criminal case. However, this is a matter largely within the discretion of the court.

"And in the absence of a palpable abuse of discretion resulting in prejudice to the complaining party, reversible error cannot be predicated upon a ruling of the trial court as to allowing leading questions." 40 Cyc. 2429, and authorities there cited.

Error was not committed in permitting the witness Murphy to answer the question claimed to be leading.

Defendant invokes the protection of Section 9, Article I, Oregon Constitution, providing that:

"No law shall violate the right of the people to be secure in their persons, houses, papers and effects, against unreasonable search or seizure * * ."

There is no evidence in the record even tending to show that the wholesome provisions of that constitutional prohibition have been violated.

Finding that the defendant has had a fair and impartial trial, it is our duty to affirm this case. It is so ordered.                              AFFIRMED.

108 Or.—27

Motion to recall mandate denied July 24, 1923.

## ON MOTION TO RECALL MANDATE.

(217 Pac. 632.)

*Mr. Charles W. Garland* for the motion.

No appearance *contra.*

BROWN, J.—The defendant has filed a motion to recall the mandate in the case of *State* v. *Casey,* decided March 20, 1923 (Or.), reported in 213 Pac. 771. For a full statement of facts, see that case.

Dan Casey was accused by the grand jury of the Circuit Court of the State of Oregon in and for Multnomah County of the crime of murder. Upon trial, he was convicted of murder in the first degree, without recommendation, and on November 26, 1921, the court, in obedience to the command of Section 1903, Oregon Laws, reading:

"Every person convicted of murder in the first degree shall be punished with death, except when the trial jury shall, in its verdict, recommend life imprisonment, in which case the penalty shall be life imprisonment * * *";

sentenced the defendant to be executed on the twenty-sixth day of January, 1922, in the manner provided by law.

An appeal was taken to this court and a certificate of probable cause was granted, staying execution of the judgment, pending the appeal.

21. At the hearing in this court, it was found that the defendant had been convicted upon a trial free from error, and—

"that the judgment of the court below in this cause rendered and entered be, and the same is, in all things affirmed."

Thereafter, a stipulation was filed extending the defendant's time in which to file a petition for rehearing. No petition was filed.

On June 18, 1923, the mandate was transmitted to the Circuit Court of Multnomah County, Oregon, and entered of record therein, and on June 21, 1923, it was ordered and adjudged by the court that the defendant be executed on the twenty-fourth day of August, 1923, in the manner provided by law.

"Mandate," as used in practice here, is the official mode of communicating the judgment of this court to the Circuit Court: 5 Words & Phrases.

On June 22, 1923, the defendant filed a motion in this court, reading:

"Comes now Dan Casey, the above named defendant and appellant, and moves the court for an order recalling the mandate from the Circuit Court of Multnomah County, and in lieu thereof to substitute a mandate in which the direction to the lower court is to sentence the defendant to life imprisonment, or to grant him a new trial, for the reason that while the evidence is sufficient to sustain the judgment, it is not sufficient to warrant the extreme penalty of the law, owing to the fact the codefendant Burns has been acquitted on the same evidence which sustains the death penalty in this case.

"This motion is supported by an affidavit of the defendant and by the record now in the files of the court. * *

"CHARLES W. GARLAND."

The attached affidavit referred to was made by the defendant, and asserts:

"That during my second trial and upon the one that rests my conviction, my leading attorney, the one

who had secured all the testimony which had been presented at the former trial which resulted in a disagreement of the jury, was intoxicated to such an extent that many matters material to my defense were omitted or presented in a less favorable way than they would have been done had my attorney been sober.''        . . .

The alleged omissions refer to the contradictions . and bias of witnesses. · Defendant's affidavit avers that his habitation was searched without a warrant, and that he was unlawfully detained before he was given a hearing; that his attorney failed to call an alibi witness, and that an X-ray picture was taken of his wounded arm over his protest.

22. At the threshold we are met with the consideration of the question of our power to recall a mandate that has not only been lawfully issued and transmitted, but which has been acted upon by the court below in accordance with law.

It is a general rule that appellate jurisdiction of the Supreme Court over a case ceases when the case has been determined and remanded to the lower court and the mandate has been entered of record in that court: See note, 11 Ann. Cas., p. 865. However, a mandate may be recalled by the appellate court for the purpose of correcting errors, or for making clear the meaning and effect of the judgment made in the appellate court: *State* v. *Pennoyer,* 26 Or. 205, 214 (37 Pac. 906, 41 Pac. 1104).

In *Livesley* v. *Johnston,* 47 Or. 193 (82 Pac. 854), the court said:        . .        ,. . .

''The preponderance of judicial authority concedes
· the power of a court of record, at any time during the term at which a judgment is rendered, to set it aside, when it was improvidently given in consequence of a false suggestion or under a mistake of facts. It

necessarily follows from this principle that when a court is vested with authority to set aside a judgment or a decree, it also possesses, as an incident to the exercise of that power, the inherent right to recall any writ or order based on the conclusion reached.''

In the case at bar, the motion to recall the mandate is not based upon a mistake of fact, nor upon a false legal premise, in our disposition of the cause.

After hearing the argument of counsel in the appeal of this cause, the court duly considered all questions contained within the record and determined them in accordance with established law, and thereafter, in due course, the clerk transmitted the court's mandate to the clerk of the Circuit Court of Multnomah County, Oregon, where it was entered of record, and, acting thereon, that court, on the twenty-first day of June, 1923, ordered and adjudged that the defendant be executed according to law, as provided by the statute, on the twenty-fourth day of August, 1923.

There being neither error of law nor of fact in the mandate or decision, we have no valid reason for recalling that mandate.

23, 24. This is an appellate court, with jurisdiction and power defined by law. In criminal causes this court is strictly a court of review. As such, we have no authority to reverse or modify the judgment of the lower court when brought before us by the mere affidavit of the defendant: *Kearney* v. *Snodgrass*, 12 Or. 311 (7 Pac. 309). By reason of the law's great humanity and its tender regard for life, we will notice the assertions contained in the affidavit. The defendant's affidavit attacks his former attorney on account of his alleged use of intoxicating liquor from a ''cached'' bottle at the time of the trial. So far as appears from the record, the defendant was entirely

satisfied with that attorney during the trial. His criticism comes only after his case has been affirmed upon appeal. His assertion contained in the affidavit is wholly unsupported. We must observe that an attorney who, while intoxicated, engages in the defense of a man on trial for his life, is unfair to his client, to the court, and to the legal profession. But voluntary intoxication by the defendant himself is no defense to his crime, nor can the alleged intoxication of an attorney who is defending him be invoked as a defense, or in mitigation of his crime. The use of intoxicating liquor shall not be invoked as a shield of protection for guilt. However, the record in the instant case shows that the attorney who represented the defendant in his trial in the court below conducted his defense with skill and ability. Moreover, the matter under investigation in this case is the guilt or the innocence of the defendant. Did Casey kill Phillips? That was the question before the trial court. Was he legally or illegally convicted in the lower court, according to the forms of law? That was the case reviewed here.

The defendant was convicted by the strength of the evidence adduced by the state, not on account of the negligence of his attorney.

Now, further, as to the affidavit: The defendant claims that he had an alibi witness who was not called. From a study of the record and the strength of the case of the state, showing that the defendant was at the scene of the crime, we are not surprised that that ''alibi witness'' made no appearance or was not called. That alibi was fictitious, according to the verdict of the jury.

25. The matter of the defendant's detention without due process, before he was given a hearing, is not

a matter that we can consider on the record here. If the defendant was detained beyond the statutory time without a preliminary hearing, he could have sought relief by a proceeding in *habeas corpus.*

The other matters averred in the affidavit refer to the bias of witnesses and the competency of the evidence. There is not an assertion contained in the affidavit that even tends to show the innocence of the defendant.

The defendant is dissatisfied with the conduct of the arresting officers. He says they were biased, but does not aver wherein their testimony was untrue. When grave crimes are committed and the offenders are run down and brought to justice, it often appears that they entertain a poor opinion of the law and of those who administer and execute it.

26. In his motion Casey admits, in the most positive terms, what it was indeed impossible for him to deny:

"That the evidence is sufficient to sustain the judgment,"

but asserts its insufficiency to sustain the penalty, owing to the acquittal of Burns. The motion does not raise a new question in this case. In our opinion on the merits, we held that the acquittal of Burns was not a bar to the conviction of Casey, and we now hold that the acquittal of Burns does not in any way affect or mitigate the penalty in the case at bar.

The theory of the state upon the trial of this cause was that Casey and Burns were equally guilty in the commission of the crime of murder; that they were both present, participating in the commission of the crime charged. It is unnecessary for us to find a reason for the acquittal of Burns, but from a careful perusal of the record the writer ventures the asser-

tion that it was due to some doubt raised in the minds of the jury as to his identification at the scene of the crime. Casey was well identified, as will be noted from the evidence set out in our former opinion.

Relative to the legal effect of the acquittal of Burns, we said, in *State* v. *Casey, supra;*

"The fact that Burns and Casey were both accused by the same indictment and that one of them has since been acquitted of the charge of murder contained in the indictment, is not competent or relevant as evidence in the trial of the other."

To like effect is *State* v. *Branton,* 33 Or. 533 (56 Pac. 267), and cases there cited.

The law exacts its penalty upon each of its violators. Each, upon conviction, must satisfy his own obligation due the offended law.

We feel our responsibility in this case and the awful import of the judgment. But we cannot lawfully grant the defendant's request to order the return of the mandate and to substitute another therefor with directions to the lower court to sentence the defendant to life imprisonment, or to grant him a new trial. Our power is circumscribed by the record and the law applicable thereto. The defendant in the case at bar was indicted for the crime of murder in its highest degree. He was tried by a jury of his peers, who heard and weighed the evidence. His guilt was clearly proved by competent evidence. He is a man of mature years. His crime shows extreme depravity. He armed himself with a deadly weapon and, in the cover of night-time, attempted to take the property of another by means of burglary and murder. The jury that heard the evidence was instructed, if it entertained a reasonable doubt of the truth of the charge, to acquit the defendant without hesitation. It

is well-established law, that in the trial of criminal causes throughout our commonwealth, the terms "not guilty" and "reasonable doubt" are synonymous. Notwithstanding that the jury was thoroughly instructed in this regard, the defendant was found guilty. It is unnecessary to expatiate upon the enormity of the offense committed by the defendant. To permit such grave crimes to go unwhipped of justice would undermine the foundation of civil society.

27. The defendant, in effect, asks us to commute his sentence from the extreme penalty of the law to life imprisonment. We are not empowered to commute or to pardon. Such authority is vested by our Constitution in the executive power, and not in the judiciary. Casey's crime has been measured by the law of the land, and that law condemns him. The verdict pronounced by the jury was the deliberate result of the calm consideration of the evidence. The record shows that Casey committed a deliberate murder while engaged in the commission of a deliberate felony.

The motion is denied.

MOTION TO RECALL MANDATE DENIED.